Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for breach of its contract of lease to mine coal on some 2,000 acres of coal-bearing lands in eastern Oklahoma.
In the latter part of 1848, or the early part of 1949, the Choctaw and Chickasaw Nations transferred the lands to the United States. Following the transfer, the Lone Star Steel Company made application for a mining lease on the lands, in a letter to J. D. Turner, the district mining supervisor of the Geological Survey, at McAlester, Oklahoma. Mr. Turner recommended to his superiors in Washington that the land be offered for lease. In April and May, 1950, the land was publicly advertised for leasing for the mining of coal. The advertisement stated in part:
A lease, if issued, will contain * * * substantially the * * * terms set out in the standard coal lease Form L-696.
Four bids were submitted as follows:
F. S. Neely-$2. 88 per acre
Coaldale Mining Company_ 1.03 ” ”
Lone Star Steel Company_ 1.05 ” ”
S. E. Evans_ 1.00 ” ”
On May 25, 1950, the Director of the Bureau of Land Management informed plaintiff that his bid was accepted “subject to approval of your qualifications and compliance *140 with any requirements which may be made in connection with the issuance of a lease. You will be promptly informed of such requirements, and lease and bond forms will be forwarded for your execution”. The lease, on standard form 4^696, was executed on September 1, 1950.
Neely planned to mine the coal by the strip-mining method. However, as soon as J. D. Turner learned that plaintiff’s bid had been accepted, he called plaintiff’s office on the telephone and advised plaintiff’s office manager that he would not be allowed to strip-mine the leased lands. Prior to this, plaintiff had not notified the lessor of the method he proposed to follow in mining the coal, but in 1947 and 1948, when the lands belonged to the Choctaw and Chickasaw Nations, plaintiff had conferred with J. D. Turner relative to obtaining a lease on the lands and had informed him that he intended to strip-mine the coal. Pie was then advised by Mr. Turner that he would not recommend a lease which would permit strip-mining.
Not only did Mr. Turner call plaintiff’s office to advise him that strip-mining would not be permitted, but a few days later, having encountered plaintiff on a highway in Arkansas, he stopped him for the purpose of informing him in person that he would not be permitted to strip-mine the lands. He followed this five days later with a letter to plaintiff, which he sent by registered mail, again notifying him that he would not be permitted to strip-mine the lands.
Plaintiff made diligent effort to have this prohibition countermanded, both by appeals to Mr. Turner himself and by appealing to Mr. Turner’s superiors in the Bureau of Land Management in Washington, and also by appeal to the Secretary, through Senator McClellan of Arkansas, but he was unsuccessful in doing so.
Since strip-mining was the only method which plaintiff thought he could profitably pursue, he assigned the lease to the Core Mining Company and withdrew from the enterprise.
He alleges that the refusal of the Department of the Interior to permit him to strip-mine the lands was a breach of his lease, that he suffered large damages as a result of the breach, and for them he sues.
*141 The lease did not prescribe the method to be pursued in the mining operations. The only provision relative thereto is the following which appears in section 4(a) :
The lessee shall carry out and observe regulations ■prescribed by the Secretary of the Interior and in force at the date hereof relative to (1) reasonable diligence, skill, and care in the operation of said property in accordance with approved methods and practices * * *.
One of the methods for mining coal which was approved by the coal mining regulations of the Department of the Interior, was strip-mining, but this was permissible only on certain conditions. Section 30 of the “Operating Kegula-tions” is headed, “Mining by Stripping.” Section 30(a), which is section 211.27 of Title 30 CFK, reads:
Sec. 30(a). No strip pit will be permitted on the outcrop of any dipping coal bed until the workable coal at lower altitude in that bed and underlying beds has been extracted, unless there is free natural or artificial drainage from the pit that will prevent seepage underground down the dip.
It will be noted that the only condition imposed on strip-mining was that such drainage be provided as would prevent seepage underground; but J. D. Turner did not issue his prohibition against strip-mining on the ground that seepage underground could not be prevented. This was not mentioned by him. He issued it on a ground not mentioned in the regulations. He stated in his testimony that he prohibited it because, “It was never contemplated in the first place. It wasn’t offered that way”, and also because, “the lease did not authorize stripping * * *.”
What may have been in the minds of the defendant’s officials when they offered to lease the lands can have no effect on plaintiff’s rights. The contract of lease determines those rights. The lease called for “operation of said property in accordance with approved methods and practices.” Strip-mining was a method approved by the regulations, on the condition stated above.
After plaintiff’s attorney had made an unsuccessful attempt to get Mr. Turner to change his mind, plaintiff wrote *142 the Bureau of Land Management outlining his plan for mining the coal. He stated that he intended to strip the—
* * * coal crop line for a length of about one-half mile in approximately the center of said lands. * * * There will be free natural or artificial drainage from the strip pit which I propose to open and operate on the leased premises, which will prevent seepage underground down the dip.
(2) After stripping the one-half mile of crop line as specified above, it is my plan to open an underground slope at a point approximately the center thereof, and then proceed with underground mining operations.
In the conference with Mr. Turner he stated that no stripping would be allowed on said leased premises. It is my position that the lease and the Operating Regulations, copy of which you sent to me, expressly authorize the stripping operation proposed. There is nothing in the notice which was published by you offering said premises for coal mining lease, or in the lease made to me, which purports in any way to prohibit the mining of coal by stripping method so long as said Operating Regulations governing coal mining methods are not violated. These Regulations do not prohibit stripping when there is free natural or artificial drainage which will prevent seepage underground down the dip. The stripping plan proposed is within this regulation and will not violate the same.
The Bureau of Land Management referred plaintiff’s letter to the Geological Survey.
J. D. Turner made several reports to the Geological Survey, one, on his interview with plaintiff’s attorney, one, on his conversation with plaintiff in the 1940’s on the possibility of leasing the lands, and on January 24, 1951 he reported in part as follows:
The northeast crop line, dipping southeast onto the leased land, has been exploited by many small mines (pigeon holes locally) which extend from opposite the west boundary to more than two miles north of the leased land. No substantial barrier pillars or slope pillars were left in connection with the above mines. Therefore, egress or ingress to the west or north part of the leased land along the coal seam is impractical. Furthermore, the old workings referred to are flooded.
Consequently from the information available the leased land can be developed by a slope mine from the *143 south, crop line in section 11 (the area Neely proposes to strip). Otherwise the large area of apparently minable [sic] coal would be rendered inaccessible except by two shafts located near the center of the property which would be very expensive.
The above in effect is similar to the reasons I gave Neely why I would not recommend stripping in this case.
It will be noted nothing was said about the impossibility of providing proper drainage, which is the only reason prescribed by the Kegulations for prohibiting strip-mining.
Furthermore, Mr. Turner’s report did not state the facts in two respects.; at least, it is in conflict with his testimony on the trial of the case.
In the first place, in his conversations with plaintiff, he did not assign the reasons given in his report for refusing to permit strip-mining. In his testimony he says stripping was prohibited because it was not contemplated when the land was advertised for lease, and the lease did not provide for it.
In the second place, he admitted in his testimony that the underground coal could be recovered by slope-mining if a “plug”, or unstripped place, was left. He said this was common practice in the locality, and was being practiced on leases supervised by him, both before and after the lease to plaintiff. He further said more than one plug could have been left on the lands in question. This is an admission contrary to the statement in his report that stripping prevented slope-mining and necessitated the sinking of expensive shafts near the center of the property.
After receipt of these reports, the Acting Director of the Geological Survey wrote plaintiff confirming the prohibition against strip-mining, assigning as reasons: first, that the lease did not permit strip-mining; second, that the local office had advised plaintiff two or three years before that stripping would not be permitted; and, third, that it would not be conducive to maximum recovery of the coal at the lower level. The latter reason seems to 'have been based on the erroneous statement in J. D. Turner’s report that two shafts near the center of the property would be necessary to recover the underlying coal.
*144 Again, it will be noted, that no reference was made to inadequate drainage.
Plaintiff replied that stripping was permitted under the regulations if proper drainage was provided, and that he proposed to provide such drainage, that he assumed his rights were governed by the law and regulations and the terms of the lease, and not by the unauthorized statement of some employee of the Department, and in conclusion he reiterated that he intended to “establish and maintain satisfactory drainage as provided by the regulations”.
Plaintiff again two months later wrote the Acting Director and also enlisted the aid of Senator John L. McClellan of Arkansas to secure a lifting of the restriction, but to no avail. On May 2,1951, the Acting Director wrote plaintiff, reiterating his denial of permission for strip-mining. For the first time in the year since plaintiff’s bid was accepted, ■the matter of drainage was mentioned. The letter stated in part:
After further review and investigation of drainage conditions incident to the proposed strip-mining operation, the Survey is still of the opinion that strip-mining of the coal deposits under consideration, would jeopardize future underground mining operations and be detrimental to the Government’s interest.
No opportunity was afforded plaintiff to outline his method of providing drainage or to show that it was adequate to protect the underlying coal. Defendant’s witnesses admitted that it was possible to provide adequate drainage. Anyway, it is apparent that the drainage objection was an afterthought, brought forward, after intervention by a United States Senator, to justify their former action.
The only condition imposed by the regulations on strip-mining was the provision for proper drainage to protect underlying coal. If this was provided, stripping was permitted. Defendant’s prohibition of it for any other reason was unjustified by the regulations. The statutes and the regulations govern plaintiff’s rights, since the lease referred only to “approved methods and practices.”
Defendant’s alleged reason for the prohibition, that strip-mining would prevent recovery of the underlying coal, was *145 proven at the trial of the case to be unjustified. Defendant’s agent, Turner, must have known it was unjustified, because stripping was being followed on other leases supervised by him without hindrance to the recovery of the underlying coal, through the medium of leaving plugs for slope-mining.
Strip-mining was prohibited by defendant’s agents before plaintiff was given any opportunity to put forward his plan of operation and to show that he was in position to comply with the regulations relative to drainage, and would do so. We are of opinion the prohibition was unjustified and constituted a breach of the contract of lease.
One further thing should be mentionéd in support of this conclusion. When plaintiff could not persuade the officials in the Department to permit strip-mining, he assigned his lease to the Core Mining Company. That company made explorations that demonstrated, to its satisfaction at least that the underlying coal could not be mined economically and, since it was not interested in strip-mining, it reassigned the lease to the Ouachita Coal Company. After this company had made some further explorations, it proposed to strip-mine for coal, and permission to do so was given. This was under the same lease given, in the first instance, to plaintiff and assigned by him. Whether the mining supervisor had become convinced that the underlying coal could not be mined profitably, we do not know.
It should also be stated that the strip-mining being carried on on other lands in the locality was also under the standard coal lease Form 4 — 696, which was used in the lease to plaintiff.
We think it clear that the prohibition of strip-mining was a breach of the contract of lease.
The Trial Commissioner did not express an opinion on whether there had been a breach of the lease contract, since he was of opinion plaintiff was barred from recovery for failure to exhaust his administrative remedy. We regret to disagree with the Commissioner, but we think plaintiff did substantially exhaust his administrative remedy.
Unless made a prerequisite to suit by statute, binding regulation or contract, the extent to which a plaintiff is required to pursue his administrative remedy is a matter for the dis *146 cretion of the court. United States v. Abilene & Southern Ry. Co., 265 U.S. 274; Cuiffo v. United States, 131 Ct. Cl. 60, and other cases cited therein. The Trial Commissioner thought plaintiff’s failure to appeal to the Secretary of the Interior prevented his resort to the court. We do not think so, since Senator McClellan brought the matter to the attention of the Secretary, as evidenced by the acknowledgment of his letter, together with the file enclosed, by an Assistant Secretary, and the statement that further investigation was being undertaken. We think this was substantial compliance with the last step in the exhaustion of plaintiff’s administrative remedy. The statute did not require plaintiff to pursue any prescribed administrative remedy as a prerequisite to suit.
This leaves the question of damages. The Trial Commissioner finds that the market value of plaintiff’s lease was $22,000, which was the commuted value of what plaintiff sold it for; but plaintiff might have been able to secure a higher price for it, if the prohibition against strip-mining had not been imposed. We do not think plaintiff’s damages are limited to this amount.
Plaintiff asks for loss of his anticipated profits. This is a recognized measure of damages, where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made. But profits are uncertain; they depend on so many contingencies, especially in a new enterprise, that it is, in most cases, impossible to say that the breach was the proximate cause of the loss of them, or that a profit would have been realized, in any event; nor is there any basis to determine what they might have amounted to. This is especially true where the breach occurred before operations had begun.
This question is carefully and fully considered in an opinion written for the court by Judge Littleton in the case of Chain Belt Co. v. United States, 127 Ct. Cl. 38. We shall not repeat what we said there. Suffice it to say that almost always, in the case of a new venture, the fact that there would have been a profit, had there been no breach, is too *147 shrouded in uncertainty for loss of anticipated profits to form a reliable measure of the damages suffered.
In this case, however, some fo¡ur or five years after the breach, the leased lands were actually strip-mined and 132,000 tons of coal were extracted. Operations were carried on for a year or two and then ceased, due to the discovery of a fault in the seam of coal that made further operations impractical. This operation was under an assignment of the lease issued to plaintiff. The equipment used was not the same as that plaintiff proposed to use, and plaintiff claims it was inferior to his. On the other hand, no plugs, barriers, nor pillars were left and no drainage was provided, some or all of which plaintiff would have had to provide. Nevertheless, the profit realized from these operations, if, indeed, there were profits, would furnish some basis for a fairly reliable estimate of what plaintiff’s profits would have been. Unfortunately, however, no proof was introduced to show whether or not a profit was realized from these operations and, if so, how much.
Since this seems to us the best available proof on which to base an estimate of plaintiff’s loss,[1] the case is remanded to Trial Commissioner White to take proof on the financial return from this operation; also on comparative costs of operation then and in 1950 and 1951 and with the equipment used and that plaintiff intended to use; whether plaintiff would have been able to extract more or less coal with the equipment he intended to use; the cost of providing drainage, and of leaving such plugs, barriers and pillars as were necessary at the time plaintiff intended to operate,; and other relevant factors; and to report thereon, with his estimate of what plaintiff’s profits might reasonably have been expected to be. If the parties are able to agree on this amount without the taking of proof, he will so report, giving the amount agreed upon.
Plaintiff is entitled to recover and judgment will be entered to that effect, but the amount of the judgment is reserved until the incoming of this report.
It is so ordered.
*148 Dtjefee, Judge; LaeamoRe, Judge; Madden, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. Defendant (acting through an official of the Bureau of Land Management, Department of the Interior) executed a lease to the plaintiff, dated September 1, 1950, covering 2,162.71 acres of public land in the vicinity of Bokoshe, Oklahoma, comprising portions of sections 1, 2, 3, 10,11, and 12, T. 8 N., R. 24 E., Indian meridian.
2. (a) Coal exists in the form of seams or beds among the earth’s strata. These seams or beds of coal originated as vegetable deposits laid down in water, and they were originally rather level. Subsequently in the earth’s history, other deposits of clay and sand were put on top of the coal, sometimes to the extent of thousands of feet in thickness, and the various strata were thereafter affected by pressures and readjustments within the earth. In the process, the original fairly horizontal coal beds were altered. Many of them became wrinkled and broken, or were given an entirely different slope.
(b) A coal-seam crop line or outcrop is the intersection of the surface of the earth with a coal seam that has been altered by the geological processes previously mentioned, so that it has a slope different from that of the earth’s surface.
(c) The land with which this case is concerned lies on the south side of a synclinal formation or basin that is from 2y2 to 3 miles wide. The basin is underlain by a coal deposit known as the Hartshorne coal seam, which extends through a considerable area in eastern Oklahoma and western Arkansas. As of the late 1940’s, there were a number of abandoned underground coal mines along the north outcrop of the Hartshorne seam in the vicinity of Bokoshe, Oklahoma. The tunnels in those mines, following the coal seam as it sloped or dipped south toward the axis of the syncline, went down for distances of from 1,000 to 1,500 feet. From *149 those tunnels, it could be observed that the coal seam on the north side of the basin was from 4 feet to 5 feet thick, with an occasional thin parting or middle band of rock from iy2 inches to 4 inches thick in the middle of the coal bed. The coal was of good quality.
(d) Prior to 1950, on the south side of the basin there had been practically no exploratory work. On the land subsequently leased to plaintiff there was one drill hole in section 1, no drilling in sections 2, 3, and 10, nine holes in section 11, and three holes in section 12. The holes go through the overburden and one seam of coal. They do not show the distance between seams.
3. (a) Prior to May 24,1949, the land involved in the litigation was owned by the Choctaw and Chickasaw Indian Nations. This land, together with a large area of additional Choctaw and Chickasaw lands found by the Secretary of the Interior to be principally valuable for their coal and asphalt deposits, had been segregated and reserved from allotment by the Secretary -under the Act of July 1,1902 (32 Stat. 641, 654). The coal and asphalt deposits in the segregated lands were the common property of the members of the tribes.
(b) Prior to May 24, 1949, the coal deposits in the land with which we are concerned, and in other lands owned by the Choctaws and Chickasaws, were subject to leasing under rules and regulations prescribed by the Secretary of the Interior. The pertinent regulations (25 CFB, 1938 ed., Part 207) provided that applications for such leases should be made to the Superintendent for the Five Civilized Tribes (sec. 207.1); that “All applications for leases shall be referred by the Superintendent to the mining trustee for the Choctaw and Chickasaw Nations, who after consulting with the local representative of the Geological Survey shall submit his recommendation and report,” and, if authorized by the Superintendent, “then the mining trustee * * * shall enter into leases with the applicant * * *” (sec. 207.3); and that “All mining operations on said leases shall be conducted under the supervision of the mining trustee for the Choctaw and Chickasaw Nations and the representative of the United States Geological Survey at McAlester, Oklahoma * * *” (sec. 207.6).
*150 (c) The Act of June 28,1944 (58 Stat. 463, 483) authorized the Secretary of the Interior to enter into a contract on behalf of the United States with the Choctaw and Chickasaw Nations for the purchase of their title in the lands and mineral deposits segregated and reserved from allotment under the Act of July 1, 1902. The 1944 statute provided that when the lands and mineral deposits were acquired, they should become part of the public domain and should be subject to the mining and mineral leasing laws applicable to the public lands of the United States. Under the authority of the 1944 statute, a contract was entered into on October 8,1947, between the Secretary of the Interior, acting for the United States, and the Choctaw and Chickasaw Nations. This contract was ratified by the Joint Resolution of June 24, 1948 (62 Stat. 596). Subsequently, the purchase price provided for in the contract was appropriated by the Act of May 24,1949 (63 Stat. 76, 84), and the ownership of the segregated lands and mineral deposits thereupon passed to the United States.
(d) After the ownership of the segregated lands and mineral deposits was transferred to the United States, such lands and mineral deposits became subject to leasing under the Mineral Leasing Act of February 25, 1920, as amended (30 U.S.C. 181 et seq.), and the development and operation of coal mines on such lands became subject to the Interior Department’s Coal-Mining Operating and Safety Regulations (30 CFR, 1949 ed., Part 211).
4. During the period from 1944 to 1952, J. D. Turner was the district mining supervisor of the Geological Survey stationed at McAlester, Oklahoma. In that position, he was the representative of the Geological Survey referred to in the regulations governing the mineral development of the segregated Choctaw and Chickasaw lands prior to May 24, 1949 (see finding 3(b)), and he continued to supervise such activities on the same lands after May 24, 1949, under the pertinent regulations relating to public lands (see finding 3(d)).
5. At all pertinent times, there were other coal lands in and around Bokoshe, Oklahoma, which were privately owned and were not subject to control by the Department of the *151 Interior. Such lands were generally referred to as “fee lands.”
6. The plaintiff, F. S. Neely, is a graduate mining engineer, with many years of experience in the coal-mining business. He has been an established and active coal operator in eastern Oklahoma and western Arkansas since 1944. From 1947 through the early part of 1950, the plaintiff engaged in strip-mining operations along the north crop line of the Hartshorne coal seam near Bokoshe, Oklahoma, and produced approximately 40,000 tons of coal per year during the period. Most of this strip-mining was conducted on fee lands, but the plaintiff strip-mined one tract of segregated Indian land, with the approval of the Interior Department, prior to May 24, 1949. His operations were profitable during the period 1947-1950, despite adverse operating conditions in the nature of old abandoned underground mine workings on the lands that he strip-mined and a steeply slanting coal bed.
7. Strip-mining is a form of mining in which the operator of a mine strips away the so-called overburden, i.e., the beds or strata of rock or earth that lie between the coal and the surface. The stripping is done with a machine, usually a dragline, which is operated in the open and which makes a pit that uncovers the coal. The coal can then be extracted speedily, and usually in a fairly clean condition. In the coal fields of eastern Oklahoma and western Arkansas, the land can be stripped effectively to a depth of 60 or 70 feet. There is an economic limitation to a stripping operation, and it is based on the ratio between the amount of waste material removed and the amount of coal recovered. When it is necessary to go quite deep in order to reach the coal, the ratio of the waste material to the coal becomes large, and the operation therefore becomes uneconomical. In a stripping operation, a large machine is more economical to operate than a small machine, in relation to the results achieved.
8. In 1947 and 1948, the plaintiff conferred with J. D. Turner and the mining trustee for the Choctaw and Chickasaw Nations regarding the possibility of obtaining a lease to strip-mine coal from the land mentioned in finding 1. On those occasions, Mr. Turner and the mining trustee believed, *152 and so informed the plaintiff, that the 4- or 5-foot seam of coal, with a thin middle band or parting of rock, which could be observed in the area of the north outcrop (see finding 2(c)) extended southward through the basin nearly to the south crop line; that the land in question would provide a good site for a large underground coal mine; that such an underground coal mine would result in the recovery of the maximum amount of coal from the land; that there would probably be a need for such an underground coal mine within a few years to meet the expected demand for coal to be used in the manufacture of steel; and that only from 1 to 3 percent of the total amount of coal in the land could be obtained by means of strip-mining. Mr. Turner and the mining trustee further informed the plaintiff in 1947 and 1948 that, for the reasons previously indicated, they would not recommend the issuance to him of a lease for the strip-mining of the land involved in the present litigation.
9. At all times pertinent to this litigation, there was a recognized and accepted mining procedure in the operation of a strip mine for coal whereby a plug or barrier pillar several hundred feet long could be left, unstripped, along the crop line for the purpose of preserving an entry for subsequent slope mining to reach underground coal, if necessary. This method was recognized as a satisfactory means of preserving access to underground coal after the completion of strip-mining operations. The leaving of such plugs was common in the eastern Oklahoma coal-field areas, and some were left during the period 1948-1950 and subsequently in connection with the strip-mining of segregated Indian lands (or public lands after May 24, 1949) under the supervision of J. D. Turner.
10. Commencing in 1948, S. E. Evans strip-mined coal on segregated Indian land (or public land after May 24, 1949) under the supervision of J. D. Turner on another branch of the Hartshorne coal seam which lies approximately 5 miles from the land involved in the present litigation. Several plugs, or unstripped areas, were left in the crop line for the purpose of preserving a means of access for later underground slope mining. This stripping operation was actively *153 in progress at the time of the advertisement for bids in connection with the lease involved in this case.
11. During the period 1948-1950, Hanford Farrell’s Spiro Stripping Company was stripping coal along the Hartshorne south crop line on segregated Indian land (or public land after May 24,1949) located approximately 10 miles from the land mentioned in finding 1. This operation was under the supervision of J. D. Turner as district mining supervisor. One plug was left in the crop line at Mr. Turner’s direction for the purpose of preserving a means of access for later underground mining. Mr. Farrell’s organization owned a large dragline and other mining equipment that were used in the stripping operation. The dragline had a 170-foot boom with a 15-cubic-yard bucket. The boom could be extended to 200 feet; and, when so extended, a 13-yard bucket was used with it. With this machine, land could be strip-mined effectively to a depth of approximately 65 feet.
12. During the period 1948-1950, stripping operations for the mining of coal were being conducted in the vicinity of Bokoshe, Oklahoma, on various other tracts of segregated Indian land (or public land after May 24, 1949) that were under the jurisdiction of the Department of the Interior and the supervision of the district mining supervisor. These other strip mines were operated under leases executed on standard coal lease form No. 4-696.
13. By 1950, economic conditions had forced the closing of most underground coal mines in the eastern Oklahoma and western Arkansas area, and particularly in the vicinity of Bokoshe, Oklahoma. Strip-mining had become the dominant method used for mining coal in the area. The only underground coal mines in the area remaining active were captive mines belonging to steel-mill companies.
14. (a) In 1948, the Lone Star Steel Company, which has the largest underground coal-mining operations in Oklahoma and does not operate strip mines, made application to the mining trustee of the Choctaw and Chickasaw Nations for a coal-mining lease on the land referred to in finding 1. However, action on the application was held in abeyance because of the prospective transfer of the land to the United States. Following the transfer, the Lone Star Steel Company re *154 newed its application for a lease in a letter dated September 19, 1949, to J. D. Turner. Mr. Turner recommended to bis superiors in Washington that the land be offered for lease. Thereafter, the Geological Survey recommended to the Bureau of Land Management that the land be offered for leasing, and the BLM agreed. In April and May of 1950, the land was publicly advertised for a coal lease.
(b) The advertisement stated in part as follows:
Notice is hereby given that the lands listed herein * * * are offered for coal lease, through sealed bids, at a minimum bid of $1 an acre, on the terms hereinafter specified to the qualified bidders of the highest cash amounts an acre as a bonus for the privilege of leasing under section 2 of the Act of February 25, 1920 (41 Stat. 438, U.S.C. 201), as amended. * * * Terms for each unit: A royalty of 15 cents a ton, mine run; a minimum expenditure of $25,000 on or for the benefit of the land, of which expenditure not less than one-third shall be expended during each of the first three years of the lease, unless sooner expended; a minimum annual production to a royalty value of $4,000 a year beginning with the fourth lease year; a bond in the sum of $10,000. A lease, if issued, will contain * * * substantially the * * * terms set out in the standard coal lease Form 4^696. Prior to the issuance of a lease the successful bidder must pay the remainder of the bid made by him and the annual rental at the rate of 25 cents for each acre or part thereof for the first lease year. He must also execute and file lease forms and a satisfactory bond of the amount specified herein (43 CFB. 193.13). * * *
15. Pursuant to the advertised offer, the following bids were received by the Bureau of Land Management:

Per acre

F. S. Neely_$2. 88
Coaldale Mining Company- 1. 03
Lone Star Steel Company- 1. 05
S. E. Evans_ 1. 00
16. Prior to submitting his bid, the plaintiff went on the land and drilled approximately 20 or 25 prospecting holes. The drilling was done without having obtained a permit to drill. Subsequently, the plaintiff never informed the office of the district mining supervisor that he had done *155 the drilling, and he did not furnish to that office any information obtained from the drilling.
17. Prior to submitting his bid, the plaintiff entered into an agreement with Hanford Farrell under which the large dragline and other equipment mentioned in finding 11 were to be used in strip-mining the land if the plaintiff should be successful in obtaining a coal lease on the land.
18. By means of a letter dated May 25,1950, the Director of the Bureau of Land Management informed the plaintiff as follows:
Your bid of $2.88 bonus per acre for Unit 1581 at the sale of coal leases held May 24, 1950, is the highest received and is accepted, subject to approval of your qualifications and compliance with any requirements which may be made in connection with the issuance of a lease. You will be promptly informed of such requirements, and lease and bond forms will be forwarded for your execution.
19. On May 25,1950, the Fort Smith, Arkansas, newspaper carried an Associated Press item which stated that the plaintiff was the highest bidder for a coal lease on the land mentioned in finding 1.
20. Sometime between May 25 and June 1,1950, J. D. Turner, whose opinion regarding the proper method of developing the coal resources in the land referred to in finding 1 was still the same as it had been in 1947 and 1948 (see finding 8), called the plaintiff’s office on the telephone and had a conversation with the plaintiff’s office manager relative to the plaintiff’s bid for a coal lease. During the course of the conversation, Mr. Turner informed the office manager that the plaintiff would not be allowed to strip-mine the land involved in the plaintiff’s prospective lease.
21. (a) On or about June 1,1950, J. D. Turner encountered the plaintiff as they were both traveling on a public highway in western Arkansas. Mr. Turner “flagged” the plaintiff, and engaged him in conversation. Mr. Turner informed the plaintiff that he would not be permitted to strip-mine the land involved in the plaintiff’s prospective coal lease, and that he would not be permitted to open an underground mine until he had submitted a plan of development. The sections of the operating regulations relating to development *156 plans (30 CFE, 1949 ed., 211.19, 211.20) were called to tbe plaintiff’s attention by Mr. Turner.
(b) Tbe conversation mentioned in paragraph (a) of this finding was confirmed by J. D. Turner on June 6, 1950, in a letter addressed to the plaintiff and stating as follows:
In confirmation of our verbal conversation June 1, 1950 this is to advise you that no stripping or small •outcrop openings were contemplated on leasing Unit No. 1581, comprising land in T. 8 N., It. 24 E. Therefore, when your lease is completed you are requested not to commence any stripping or small underground slopes which contemplate rooms directly off the slope or slope air course.
In event you decide to complete the lease and develop a mine that will permit maximum recovery of the coal from the synclinal basin, prepare your plan of development in accordance with the operating regulations with special attention to Sections 22, 23, 51, 52, and 53, except the thickness of the slope pillars will be in excess of 100 feet which can be determined after prospect drilling of the basin area which will show the quality of the overlying strata and the maximum overburden.
An additional copy of the operating regulations (41 Stat. 437) is enclosed for your files.
This office will be pleased at any convenient time to assist you in outlining your prospecting and plan of development.
22. As the plaintiff was the highest bidder for a coal lease on the land mentioned in finding 1, the lease was awarded to him. A written lease contract (BLM-C-018126 (Oklahoma)) between the United States (acting through an official of the Bureau of Land Management, Department of the Interior) and the plaintiff was entered into as of September 1,1950. The only provision of the lease relevant to plaintiff’s right to conduct strip-mining reads:
SeotioN 4. This lease is made subject to the following provisions * * *:
(4a) The lessee shall carry out and observe regulations prescribed by the Secretary of the Interior and in force at the date hereof relative to (1) reasonable diligence, skill, and care in the operation of said property in accordance with approved methods and practices l]t * SÜ
*157 SectioN 5. And the lessee also expressly agrees that all mining and related operations shall be subject to the inspection of authorized representatives of the lessor, and that such representatives, with all proper and necessary assistants, may at all reasonable times enter into and upon the leased lands and survey and examine same and all surface and underground improvements, works, machinery, equipment, and operations.
Section 30 of “Operating Kegulations” to govern coal-mining methods, etc., relates to “Mining by Stripping.” Section 30(a) (Title 30 CFK, §211.27) reads as follows:
Requirements and prohibitions — (a) Drainage of stripping operations. No strip pit will be permitted on the outcrop of any dipping coal bed until the workable coal at lower altitude in that bed and underlying beds has been extracted, unless there is free natural or artificial drainage from the pit that will prevent seepage underground down the dip.
(b) Fire prevention. Accumulations of slack coal or combustible waste that may, if fired, endanger the coal deposit shall not be permitted at or near coal or carbonaceous material in place.
(c) Overhanging banks. Overhanging banks or ledges must be shot down promptly to eliminate danger to employees from falling rock or dirt.
(d) Goal face to be covered in strip pits. Upon completion or indefinite suspension of mining operations in all or any part of a strip pit, the face of the coal shall be covered with noncombustible material that will effectively prevent the coal bed from becoming ignited.
(e) Underground workings from strip pits prohibited, The driving of underground working places from the face of a strip pit for the purpose of getting cheap coal is contrary to conservation principles and is prohibited.
23. Hanford Farrell was on friendly terms with J. D. Turner and spoke to him several times during the fall of 1950 with respect to the lease in question. On each of these occasions, Mr. Farrell was informed by Mr. Turner that he (Turner) was not going to permit the plaintiff to strip-mine the leased land.
24. On December 1, 1950, J. D. Turner called at the office of H. P. Warner in Fort Smith, Arkansas, at Mr. Warner’s request. Mr. Warner, who was the attorney for the plain *158 tiff, asked Mr. Turner if be would change his mind about authorizing the plaintiff to strip-mine the leased land. When Mr. Turner replied in the negative, Mr. Warner said that an appeal would be taken from Mr. Turner’s decision. Mr. Turner suggested that a development plan be made up and sent along with the appeal.
25. Following the conference on December 1,1950, between J. D. Turner and H. P. Warner, the plaintiff wrote the Director of the Bureau of Land Management a letter dated December 5,1950, stating in part as follows:
In a recent conference between my representative and Mr. Turner, District Mine Supervisor, he was informed of my plan for developing the said lease substantially as follows:
(1) Stripping the coal crop line for a length of about one-half mile in approximately the center of said lands. On the west side of said one-half mile strip the crop of the coal bed has been faulted out vertically and no normal crop exists. On the east side of said mentioned one-half mile strip the normal crop appears for a length of about one-fourth mile on adjacent fee land on which there is an old abandoned slope. There will be free natural or artificial drainage from the strip pit which I propose to open and operate on the leased premises, which will prevent seepage underground down the dip.
(2) After stripping the one-half mile of crop line as specified above, it is my plan to open an underground slope at a point approximately the center thereof, and then proceed with underground mining operations.
In the conference with Mr. Turner he stated that no stripping would be allowed on said leased premises. It is my position that the lease and the Operating Regulations, copy of which you sent to me, expressly authorize the stripping operation proposed. There is nothing in the notice which was published by you offering said premises for coal mining lease, or in the lease made to me, which purports in any way to prohibit the mining of coal by stripping method so long as said Operating Regulations governing coal mining methods are not violated. These Regulations do not prohibit stripping when there is free natural or artificial drainage which will prevent seepage underground down the dip. The stripping plan proposed is within this regulation and will not violate the same.
*159 Since it is desirable to commence work on the developing of the leased premises, I desire to request that I be authorized to proceed in accordance with the plan outlined above without delay. Kindly advise if I can proceed with work on said premises as indicated above.
26. The Bureau of Land Management transferred the plaintiff’s letter of December 5, 1950, to the Geological Survey for action, and Mr. Neely was so informed.
27. J. D. Turner thereafter made several reports concerning the controversy to his superior, the Chief of the Mining Branch, Geological Survey. In a memorandum dated January 9, 1951, he reviewed his meeting with H. P. Warner on December 1, 1950 (see finding 24); in a memorandum dated January 19, 1951, he reported the earlier unsuccessful efforts by Mr. Neely in the 1940’s to obtain from the mining trustee permission to strip-mine this land (see finding 8); and in a memorandum dated January 24, 1951, he restated some of the reasons for his unwillingness to approve the strip-mining of the land. The memorandum of January 24,1951, stated in part as follows:
The northeast crop line, dipping southeast onto the leased land, has been exploited by many small mines (pigeon holes locally) which extend from opposite the west boundary to more than two miles north of the leased land. No substantial barrier pillars or slope pillars were left in connection with the above mines. Therefore, egress or ingress to the west or north part of the leased land along the coal seam is impractical. Furthermore, the old workings referred to are flooded.
Consequently from the information available the leased land can be developed by a slope mine from the south crop line in section 11 (the area Neely proposes to strip). Otherwise the large area of apparently min-able coal would be rendered inaccessible except by two shafts located near the center of the property which would be very expensive.
The above in effect is similar to the reasons I gave Neely why I would not recommend stripping in "this case.
Moreover, old mine workings in this area along the west and north side of the lease encountered coal 4 to 5 feet thick, and should this thickness of coal prevail the lease has a possible reserve of 8 to 10 million tons *160 of coal with an estimated recovery of only 60 per cent. Whereas the estimate of available strip coal would vary from 100,000 to 300,000 tons, depending on depth of cover stripped.
Furthermore, the fault extending across the NW% of section 12, and the faulted condition extending across the S% of section 10 makes it apparent that any slope developed from the crop should be located on the crop line somewhere in the W %ths of section 11.
28. By means of a letter dated January 30,1951, the Acting Director of the Geological Survey advised the plaintiff as follows:
Reference is made to your letter of December 5, 1950 to the Director, Bureau of Land Management requesting permission to strip a portion of the crop line on coal leaseBLM-C-018126 (Oklahoma).
There is nothing in the advertised offer, such as a performance bond to insure condition work or other specifications, to indicate that stripping of the crop line would be permitted.
The record shows everyone who inquired about the matter was advised that only -underground mining would be permitted on the unit. Moreover, you were advised May 15,1947 and July 6,1948 when you inquired at the local office, McAlester, Oklahoma, that stripping would not be permitted on the unit involved.
Stripping of the crop line or the use of nonpermissible equipment underground as proposed by your representative (H. P. Warner, Attorney) to J. D. Turner would not be conducive to safety, conservation, or maximum recovery of the coal at depth which constitutes 97 to 99 per cent of the deposits involved. Furthermore, the answer to your verbal inquiries at McAlester, Oklahoma, May 15, 1947, July 6, 1948 and the registered letter of June 6, 1950 should have been sufficient to inform you that stripping would not be permitted on leasing Unit No. 1581.
This is to further advise you that stripping on the above unit will not be permitted and that compliance with the operating regulations, especially as they relate to the use of permissible equipment and adherence to a plan of development that will be conducive to safety and conservation of the coal resources, must be effectuated.
Please feel free to call on our field office at McAlester, Oklahoma, for assistance in projecting a suitable plan of development for your underground operations.
*161 29. On February 10, 1951, tbe plaintiff replied as follows to the letter of January 30, 1951, from the Acting Director of the Geological Survey:
Your letter in reference to Coal Lease BLM-C-018126 (Oklahoma), has been received.
You state that stripping will not be permitted and that the operating regulations must be effectuated. As I understand, the operating regulations are read into and constitute a part of the lease. These regulations define and recognize stripping as a method contemplated in mining operations, and stripping is permitted when free natural or artificial drainage is provided to prevent seepage underground down the dip.
Neither the lease nor the regulations prohibit stripping under the conditions specified, and the advertised notice did not indicate that stripping would not be permitted. If it had been intended to prohibit stripping it is reasonable to assume that that would have been stated in both the offer and lease. In the absence of such prohibition I think stripping operations are permitted if drainage is provided as specified, and we propose to see that such drainage is provided.
I have no information as to inquiries made by others as to stripping this coal, but the notice did not purport to prohibit stripping, and that is what I based my offer on. This coal was owned by the Indian Nations on May 15, 1947, and July 6, 1948. I was informed that they did not want to lease the coal, irrespective of the method employed, but, of course, nothing said by them would affect a lease made by the United States in 1950.
Shortly after the public announcement that our bid was accepted Mr. Turner informed an employee of ours by telephone that stripping would not be permitted and his letter of June 6th followed in a few days. While his letter stated that stripping operations were not contemplated, the advertised offer did not warrant the suggestion and we were not dissuaded from believing that the lease and operating regulations would define the rights granted and express the intention of the parties. The lease was subsequently issued and by its terms stripping is not prohibited. If there was any intent to prohibit stripping the lease would have so provided.
It has not been suggested by us, or by any representative of’ ours, that we intend to use non-permissible equipment in underground mining, even though such equipment may be used by others.
*162 We propose to establish and maintain satisfactory drainage as provided by the regulations, and with this in view we submit that we are entitled to strip the coal as specified and accordingly I respectfully ask that you withdraw your refusal.
Kindly let me hear from you promptly and oblige.
30. The plaintiff communicated with the Honorable John L. McClellan, United States Senator from Arkansas, regarding his desire to strip-mine the leased land, and Senator McClellan, in turn, wrote to the Interior Department concerning the matter.[2] On February 28, 1951, an Assistant Secretary of the Interior replied as follows to Senator McClellan:
This will acknowledge receipt of your letter of February 13, and file in connection with the request of Mr. Neely to strip-mine under his coal lease BLM-C-018126 (Oklahoma).
It is noted that you have in your file a copy of the Geological Survey’s letter of January 30, to Mr. Neely and his response thereto under date of February 10.
Further investigation of the case is presently being undertaken and you will be informed of the action taken.
Your file is returned herewith.
31. Having received no reply to his letter of February 10, 1951, the plaintiff again wrote to the Acting Director of the Geological Survey on April 9,1951, requesting a response to his letter of February 10.
32. (a) On April 21,1951, the plaintiff signed a document which stated in part as follows:
I * * * do hereby assign all my right, title and interest in and to Coal Mining Lease No. C-018126 * * * to The Core Mining Company, a corporation, retaining therein a royalty interest of Three ($0.03) Cents per ton of 2000 pounds for all coal mined or produced from said premises. The royalty interest referred to is the full consideration for this assignment. * * *
(b) The assignment was subject to the approval of the Department of the Interior; and on April 28,1951, the Core Mining Company mailed it to Washington.
33. On May 2,1951, the Acting Director of the Geological Survey wrote the following letter to the plaintiff:
*163 Replying to your letters of February 10 and April 9, on the question of authority to strip-mine coal deposits under coal lease BLM-C-018126 (Oklahoma).
After further review and investigation of drainage conditions incident to the proposed strip-mining operation, the Survey is still of the opinion that strip-mining of the coal deposits under consideration, would jeopardize future underground mining operations and be detrimental to the Government’s interest.
The Survey’s decision of January 30, denying authorization for strip-mining is affirmed subject to the right of appeal to the Secretary of the Interior.
34. The plaintiff did not take any further action before the Department of the Interior, or any of its officials, respecting the lease involved in the litigation.
35. (a) The assignment of the lease to the Core Mining Company was approved on July 27, 1951. In a decision of that date approving the assignment, the Acting Director of the Bureau of Land Management stated in part as follows:
* * * The consideration for the assignment will not constitute a burden on the leasehold, but it is expressly understood that no strip mining operations will be permitted on any portion of the leased land without the written consent of the Regional Mining Supervisor, U.S. Geological Survey at McAlester, Oklahoma.
(b) The true consideration for the assignment, and the amount paid to the plaintiff by the Core Mining Company, was $22,000.
36. Following the approval of the assignment of the lease to the Core Mining Company, that company spent $26,277.01 by August 1953 on drilling and exploration work on the leased land. Eighteen core holes were drilled by the company, and they demonstrated that, under the prevailing economic conditions, the leased land had practically no value for underground coal mining. It was found that the middle band of rock in the coal bed, which was almost negligible on the north side of the basin, increased in thickness toward the south outcrop to a maximum of 40 feet, with approximately 2 feet of coal on top of the parting and about 2% feet of coal beneath it. The coal seams were too thin, and the middle band of rock was too thick, for profitable underground coal *164 mining under the economic conditions prevailing at any time pertinent to this litigation.
37. After obtaining from its drilling program the information mentioned in finding 36, the Core Mining Company assigned the lease to the Ouachita Coal Company, an affiliated company, by an instrument dated August 12,1953, and approved by the Bureau of Land Management on October 13, 1953. The consideration for the assignment was $600.
38. A great deal of additional exploratory work was done on the leased land after the assignment of the lease to the Ouachita Coal Company. In 1954, approximately 136 auger holes were drilled in a period of 4 weeks, and the information obtained from this drilling was mapped. Thereafter, 15 more holes were drilled with a core drill. On the basis of the additional information from this drilling, it appeared that part of the length of the outcrop on the leased land could be stripped. All the information obtained from the drilling was furnished to the deputy mining supervisor at McAlester, Oklahoma, together with a detailed map showing the drilling, the contours of the land, and other matters. It was proposed by the Ouachita Coal Company to the deputy mining supervisor that a stripping operation be undertaken on the leased land. After oral discussions between an engineer representing the Ouachita Coal Company and the deputy mining supervisor, the proposed stripping operation was approved on December 16,1954.
39. (a) The Ouachita Coal Company entered into an operating agreement with the Fall River Mining Company, under the terms of which the latter company strip-mined the leased land. The Fall River Mining Company strip-mined approximately 132,000 tons of coal from the land. It used a dragline with a 135-foot boom and a 7-yard bucket; it stripped to an average depth of about 45 feet; and it stripped only about y2 mile of the crop line. The coal was produced and sold during the years 1955 and 1956, and the mining operations were discontinued in 1956. The principal reason for the discontinuance of the mining operations in 1956 was the unexpected extent of the faulting in the coal seam that was discovered during the course of the operations.
*165 (b) The Fall Kiver Mining Company stripped the leased land in the identical area where the plaintiff proposed to commence stripping. No plugs, barrier pillars, or drainage (artificial or natural) were provided, although the stripping operation was carried on under the supervision of the district mining supervisor pursuant to a plan approved by him.
(c) There were no amendments to the lease in question after its issuance to the plaintiff on September 1, 1950. Hence, the land involved in the litigation was strip-mined by the Ouachita Coal Company and the Fall Eiver Mining Company under the same lease that was originally issued to the plaintiff. Also, the same operating regulations were in effect during the strip-mining operations that had been in effect while the lease was held by the plaintiff.
(d) The underground coal left in the land at the conclusion of the stripping operation could be mined if it were economically feasible to do so.
40. A substantially greater amount of coal than the 132,000 tons (approximately) mentioned in finding 39(a) could have been strip-mined from the land involved in the litigation if the stripping had been done with the large dragline referred to in findings 11 and 17. The entire production could have been marketed at a profit.
41. (a) In October 1956, the Ouachita Coal Company requested the Bureau of Land Management to approve the relinquishment and cancellation of the lease involved in the litigation.
(b) The relinquishment of the lease was accepted and the lease was canceled by a decision of the Bureau of Land Management dated December 6,1956.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The case is remanded to the trial commissioner and the amount of the judgment is reserved until the incoming of his report.

 We do not regard proof of what was realized on some other operation some miles removed from plaintiff’s lease as reliable.

 The plaintiff’s communication to Senator McClellan and the latter’s communication to the Interior Department are not in evidence.