**CITIZENS FEDERAL BANK, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–656 C.

United States Court of Federal Claims.

May 21, 2002.

Charles J. Cooper, Washington, DC, for plaintiffs. Robert J. Cynkar, Vincent J. Colatriano, and David H. Thompson, Washington, DC, of counsel.

Henry R. Felix, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were Jeanne E. Davidson, Deputy Director; David M. Cohen, Director; and Stuart E. Schiffer, Deputy Assistant Attorney General.

## OPINION

DAMICH, Chief Judge.

### I. Introduction

This case is before the Court on Defendant's motion for summary judgment on damages, and Plaintiffs' cross-motion for partial summary judgment on damages. At issue is whether Plaintiffs are precluded as a matter of law from recovering lost profits, restitution, or reliance damages for the Government's breach of contract regarding the Equitable and the American Savings transactions. For the reasons enumerated below, Defendant's motion for summary judgment is GRANTED–IN–PART and DENIED–IN–PART, and Plaintiffs' cross-motion is DENIED.

### II. Background

The original *Winstar* cases and subsequent Federal Circuit and United States Court of Federal Claims cases, including this Court's decision on liability rendered on February 20, 2002, have extensively discussed the history surrounding the 1980's thrift crisis and the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183. Thus, it will only be revisited as necessary to the present case. With respect to the Equitable and the American Savings transactions, this Court held that because FIRREA was inconsistent with the Government's contractual promises to Citizens concerning the accounting and regulatory capital treatment of supervisory goodwill, the Government was liable. Citizens now seek damages based on this liability in the form of: (1) lost profits that would have been realized had the breach not occurred; (2) restitution to restore Citizens to the position they would have been in had there never been a contract; and (3) the cost of replacing the regulatory capital that was eliminated by the breach. In the present motion, Defendant seeks to dispose of all of these damages theories on summary judgment, as well as Plaintiffs' argument that they not be precluded from recovering reliance damages. In Plaintiffs' cross-motion, they request summary judgment on the cost of replacing the regulatory capital.

### III. Discussion

#### A. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed.Cir.

1993). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. After adequate time for discovery and on motion, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995). When the case is before the Court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999).

**B. Lost Profits**

■ Citizens seek lost profits reflecting the additional earnings they would have realized, absent the breach, in excess of earnings actually received. Pls.' Resp. Br. at 12–13. According to the Federal Circuit, "[l]ost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.'" *California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1349 (Fed. Cir.2001) (*Cal.Fed.*) (quoting *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)). In *Cal. Fed.,* the Federal Circuit held that the existence and quantum of lost profits, which are matters of fact, should not be decided on summary judgment if there are disputes of material fact. *Cal. Fed.,* 245 F.3d at 1350. The court then vacated the trial court's grant of summary judgment, finding that California Federal Bank had submitted a sufficient amount of documentary evidence and expert testimony to create a genuine issue of material fact as to the existence and quantum of lost profits.

■ In the instant case, because the Court finds certain material facts in dispute, summary judgment either for Defendant or for Citizens is inappropriate. For example, Citizens claim that the price of their sale to NationsBank was diminished approximately $84 million by the Government's breach. Citizens calculate this cost based on Professor James' expert testimony, in which he determined that Citizens had $46 million less capital[1] and then derived a tangible capital multiple of that figure representing foregone sales proceeds that Citizens suffered as a result of the breach.[2] Defendant disputes these figures, arguing both that foregone proceeds are too speculative as a matter of law and also that the use of a 1.83 fixed tangible book value is factually invalid.

Defendant also asserts that Citizens cannot recover lost profits because they failed to mitigate their harm. The parties agree that there is a legal duty to mitigate, and that such duty is imposed upon Citizens, requiring them to take reasonable precautions to limit the extent of damages as a result of Defendant's breach. *Midwest Indus. Painting, Inc. v. United States,* 4 Cl.Ct. 124, 133 (1983). Based on Professor James' statement that Citizens could have mitigated the damages caused by the depletion of their regulatory capital either by shrinking their asset base or replacing the lost regulatory capital and that Citizens chose to shrink their base,[3] Defendant claims that Citizens

---

1. The $46 million calculation represents the amount lost from 1990 to 1995 in light of Citizens' 1989 business plan's expected 6 percent rate of growth (prior to any indication of a governmental breach) dropping to an actual 2.58 percent rate of growth.

2. Professor James multiplied a 1.83 tangible capital multiple by the $46 million figure, stating that Citizens would have acquired increased earnings between 1990 and 1995 at a rate of 1.83 times their face value.

3. According to *Glendale,* a thrift that fails to comply with the capital regulations following the implementation of FIRREA, could increase its capital-to-assets ratio either through retained earnings or a reduction of the size of the institution or by raising capital. *Glendale Federal*

did not do so sufficiently. Defendant argues that Citizens had excess capital at the bank after the enactment of FIRREA that they could have invested in the incremental assets they now claim the breach prevented them from making. This "capital cushion" that Citizens possessed could have been used to acquire significantly more assets and liabilities. Despite arguments by Citizens that they chose not to leverage all of their regulatory capital based on a risk management criteria they had formulated, Defendant claims that such a decision does not obviate their duty to mitigate the perceived harm alleged in their lost profits claim.

The legal issue is whether or not the non-breaching party (Citizens) must assume additional risk in the act of mitigation in order to satisfy its duty. While that may be something the Court can determine on summary judgment, the factual issue remains whether Citizens had ample capital to assume additional risk by depleting their capital cushion. While Citizens claim that they did not, Defendant asserts that the cushion was sufficient, although Defendant witness David A. Kennedy stated that he had yet to undertake an analysis of Citizens' interest rate risk profile to properly comprehend their capital position. Such a factual issue makes it inappropriate to deny lost profits on summary judgment due to Citizens' failure to mitigate their harm, along with the other aforementioned factual disputes.

### C. Restitution

■ Because this Court found the Government liable for breach of contract in the American Savings transaction, Citizens now seek a restitutionary recovery for that transaction.[4] With respect to restitution, the Federal Circuit has held that when proof of expectancy damages fails, the law does provide a *fall-back position* for the injured party in the form of restitutionary damages. *Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001). Restitution is an appropriate remedy "to restore the non-breaching party to the position it would have been in had there never been a contract

to breach." *Cal. Fed.,* 245 F.3d at 1350. The parties here debate whether restitution is appropriate based on contrary interpretations of *Glendale.* Thus, the Court deems it appropriate to summarize precisely the holding in *Glendale* with respect to restitution and then determine whether that holding is applicable to preclude Citizens from a restitutionary recovery as a matter of law.

In *Glendale,* the Federal Circuit reviewed Judge Smith's trial court decision to grant restitution to Glendale based on the assumed risk Glendale undertook in acquiring Broward. The value of Broward's obligations or debts at the time the contract was made was subtracted from Broward's then-assets. The resulting amount, a negative figure of nearly $800 million, was deemed to be the amount that the Government benefitted from the contract, and thus the amount to which Glendale was entitled as restitutionary damages.

Glendale had argued that its assumption of the market value of Broward's net liabilities was a benefit to the Government because Glendale thus had relieved the Government of its imminent responsibility for those liabilities. Also, Glendale had asserted that its cost of performance (or the Government's benefit) should have been measured as of the time of its performance (November 1981) so subsequent events, such as the fall in the interest rates, were irrelevant other than in calculating the offset amount of Glendale's benefit.

The Government responded to Glendale's argument by asserting that the amount of Broward's excess liabilities was not a cost to Glendale of performing under the contract because Glendale never actually paid Broward's excess liabilities. Further, in no scenario would Glendale ever pay Broward's excess liabilities because if interest rates had not declined, both Broward and Glendale would have failed and the FSLIC (the Government) would have had to pay both Broward's and Glendale's depositors.

According to the Federal Circuit, the Government's breached promise did have sub-

---

*Bank, FSB v. United States,* 239 F.3d 1374, 1378 (Fed.Cir.2001).

**4.** · Citizens do not seek restitutionary damages for the Equitable transaction.

stantial value, as any party choosing between purchasing a failing thrift without the Government's promise regarding supervisory goodwill and purchasing one with the promise would certainly prefer the latter. That said, Glendale's acquisition of the failing thrift did not result in the Government (specifically the FSLIC) saving the dollar value of the net obligations of the thrift, as it is not at all clear that the Government would have been called upon to make up that deficit then and there. Glendale was one of a number of potential acquirers of Broward, and the Government could have potentially hired new and better management to attempt to run Broward successfully. Thus, what the Government really received in exchange for its promise was time to deal with other failing S & Ls and time to avoid having to commit substantial resources to the problem. According to the Federal Circuit, the value of that time is impossible to quantify.[5] Thus, because the gains are both speculative and indeterminate, the Federal Circuit vacated Judge Smith's grant of restitutionary damages.

In the present case, the Court must determine if Citizens are entitled to restitution regarding the American Savings transaction. In support of its motion, Defendant argues that Glendale applies to preclude Plaintiffs from restitutionary damages as a matter of law under a "benefits conferred" approach. Because the instant case appears to mirror Glendale in terms of the arguments in favor of restitution for the alleged Government saving of liquidation expenses by acquiring the failing thrift, and because the Federal Circuit rejected those arguments in Glendale, the Court turns to Citizens' assertions regarding how this case can be distinguished from Glendale. Citizens argue that they can recover regardless of Glendale and that they conferred a benefit of $100.8 million on the Government.[6] Citizens indicate that they assumed actual liabilities representing real losses incurred, as opposed to Glendale, where Glendale was denied restitution because the net liability "never came to pass."[7] Specifically, Citizens' acquisition of American Savings included acquiring American Savings' $17 million net liability stemming from operating losses as well as the lessened quality of their assets. Citizens contrast this established burden with Glendale, where the liability Glendale assumed resulted from low interest rates on the acquired thrift's assets and high interest rates on its deposit base, which coincided to drive down the value of the acquired thrift's assets. That liability was later erased when the interest rates returned to normal levels. According to Citizens, the present case is distinguishable because Citizens absorbed a real liability when they acquired American Savings, resulting in a substantial benefit to the Government, unlike Glendale's assumption of a liability that never materialized.

After careful analysis of Glendale in light of the arguments posited by Citizens, the Court finds no substantive basis upon which the present case can be distinguished from Glendale. The Federal Circuit did note in Glendale that because interest rates leveled out, neither Glendale nor the Government was forced to pay potential losses. That statement, however, was not the basis upon which the Federal Circuit deemed restitutionary damages to be too speculative and indeterminate. Restitution based on a "ben-

---

5. The Federal Circuit also notes that even after Glendale's acquisition of Broward, the Government was not free of potential liability for the failing thrift. Had interest rates remained high and Broward and possibly Glendale failed, the Government's contingent liability would have matured and it would have had to step in at that time and assume the very same losses that Glendale now claims were benefits that the Government received.

6. According to Citizens' expert, Professor James, the saved expense of liquidation is $253 million. That amount must be offset by the $189 million in FSLIC assistance that Citizens received at the time of acquisition. The remaining $64.1 million, plus projected earnings on that amount, results in $100.8 million that the FSLIC saved in costs it would otherwise have incurred in liquidating American Savings had Citizens not acquired it.

7. Specifically, the liability in Glendale resulted from a mismatch between low interest rates on the acquired thrift's fixed rate asset portfolio and high interest rates on the thrift's variable rate deposit. When the interest rates fell to normal levels, however, the value of the acquired thrift's assets rebounded, erasing the net liability.

efit conferred" theory requires "determining what benefit from the contract the breaching party has received, and restoring that to the nonbreaching party." *Glendale,* 239 F.3d at 1381. Speculation and uncertainty arise in attempting to ascertain what exact benefit the breaching party (the Government) received, which encompasses more than just ascertaining a net liability taken on in acquiring a failing thrift. Thus, while the Federal Circuit in *Glendale* found the lack of an actual net liability as illustrative of the speculative nature of restitution, the overall uncertainty associated with that remedy is the impossibility of ascertaining the exact benefit conferred on the Government. As the court noted in *Glendale,* the true benefit to the Government was time— "time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth." *Id.* at 1382.

Moreover, Citizens' restitutionary damages claim in the present case is for $100.8 million, a figure calculated based on a starting figure of avoided liquidation costs to the Government of $253 million. These figures reflect a much greater amount than the $17 million in actual liability taken on in acquiring American Savings. Thus, this Court finds applicable the same rationale by which the Federal Circuit denied restitutionary damages in *Glendale,* including that the Government may not have ended up having to bail out American Savings, as another acquirer may have done so, or alternatively the Government may have hired better management that could have potentially made American Savings profitable.

Because the damages sought by Citizens for "benefits conferred" are too uncertain, restitution on this basis is precluded as a matter of law.[8]

### D. Reliance Damages

While reliance damages were not a basis of Defendant's initial motion for summary judgment on damages, Defendant asserts in its reply brief that Plaintiffs should not be allowed to assert reliance damages as a potential remedy at trial. Plaintiffs group reliance in the same category as restitution, defining reliance damages as "placing the non-breaching party in as good a position as he would have been in had the contract not been made." While this is the manner in which the Federal Circuit defines restitution (see *Glendale* and *Cal. Fed.*), reliance is now defined by the Federal Circuit as entitling the party who relies on another party's promise (made binding through contract) to damages for any losses actually sustained as a result of the breach of that promise. *Glendale,* 239 F.3d at 1382–83. Thus, reliance damages are a reimbursement for losses suffered, not an attempt to make it as if the contract had never existed. Because Plaintiffs' argument that these two theories of recovery are identical is inherently flawed, the Government is correct in its assertion that allowing reliance damages to be brought up as a theory of recovery is allowing a totally new and as-yet-explored area of recovery. Thus, on the basis of Plaintiffs' misidentification of reliance damages and their failure to previously assert a claim for such relief, the Court grants summary judgment for Defendant with respect to this issue.

### E. Cost of Replacement Capital

■ Citizens seek expectancy damages under a cost of replacement capital theory, based on an assessment of the cost of replacing the regulatory capital that was eliminated by the Government's breach. That cost includes the cost of replacing the supervisory goodwill and capital credit at the time of the breach. In *Cal. Fed.,* the Federal Circuit affirmed Judge Hodges' finding that the replacement cost damages incurred by California Federal Bank were the transaction costs associated with the replacement (flotation costs).

Here, it appears that Citizens are willing to forego their claim for lost profits (thereby avoiding a lengthy trial) if the Court grants their cross-motion for summary judgment and awards replacement cost damages in the form of exchanging the subordinated debt for

---

8. In response to Defendant's argument, the Court agrees that because restitution for "bene- fits conferred" is inappropriate here, so too is interest earned on such alleged benefits.

preferred stock. Citizens request this remedy because payments on preferred stock are not tax deductible and must be paid out of after-tax earnings, as opposed to payments on subordinated debt, which are tax deductible and are made out of pre-tax earnings. Thus, Citizens' after-tax cash flow was impacted negatively by preferred stock, causing them to make this request as a means of satisfying the cost of replacement capital. According to Citizens, this is a pragmatic approach to place the non-breaching party in a position they would have enjoyed absent the breach.

If the Court were to find for Citizens with respect to this issue and Citizens were to drop their claim for lost profits, and because restitution is precluded, the case would have a chance of being fully decided. The legal issues concern whether replacement costs are actual or, as Defendant posits, merely theoretical and irrelevant. A remaining factual issue precluding summary judgment, however, is that Defendant argues that the cost of replacement capital is transaction costs, as Judge Hodges found, rather than the exchange of subordinated debt for preferred stock. It is unclear to the Court why the parties have not presented any evidence of discussions among the parties as to reaching a compromise on this issue. Because the Court remains unsure as to the positions of the parties on this issue, and because a potential issue of fact remains in dispute, the issue of cost of replacement capital can not be disposed of on summary judgment.

## IV. Conclusion

The Defendant's motion for summary judgment on damages is GRANTED–IN–PART and DENIED–IN–PART. The Plaintiffs' cross-motion for summary judgment on damages is DENIED.

It is further ORDERED that the Court will hold a status conference on June 20, 2002, at 10:00 a.m. to explore the possibility of settlement and, if necessary, to move forward with scheduling a trial on damages. All parties are requested to appear in person.