**INDUSTRIAL DOOR CONTRACTORS, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 01–411C.**

United States Court of Federal Claims.

Nov. 2, 2007.

Andrew R. McBride, Atlanta, GA, for Plaintiff.

Lauren S. Moore, with whom were Brian M. Simkin, Assistant Director, Jeanne E. Davidson, Director, and Peter D. Keisler, Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C., for Defendant. James I. Wilson, Assistant General Counsel, Smithsonian Institution, Of Counsel.

John M. Bergen, Law Clerk; Diana Krevor, Intern.

## OPINION

BASKIR, Judge.

This case is before us on remand from the U.S. Court of Appeals for the Federal Circuit. On September 20, 2005, we granted summary judgment in favor of the Defendant after concluding that the parties had not entered into a binding settlement agreement to resolve the Plaintiff's bid protest. Our ruling was based on perceived ambiguities in the Government's alleged offer. The Plaintiff, Industrial Door Contractors, Inc. ("IDC"), successfully appealed the decision to the Court of Appeals. The Court of Appeals held that a binding agreement had been formed, reversed this Court's judgment and remanded the case for further proceedings.

Each party subsequently filed motions for summary judgment on the issues of breach of the settlement agreement and on entitlement to damages, neither of which had been presented on appeal. After carefully considering the renewed briefing, as well as the presentations of counsel at oral argument, we conclude once again that Defendant is enti-tled to judgment as a matter of law. While the settlement agreement was breached, Plaintiff cannot establish that the breach entitles it to lost profits on a separate procurement contract.

**We DENY Plaintiff's motion for summary judgment and GRANT Defendant's cross-motion for summary judgment.**

## BACKGROUND

### I. Facts

IDC requests damages for breach of express contract under the Tucker Act, 28 U.S.C. § 1491(a)(1), based on its allegations that the Government violated the terms of a legal settlement agreement in a bid protest. Although the case centers around the bid protest and Plaintiff's eligibility to compete in a procurement, IDC's claim is not premised on a procurement violation. With that in mind, we start with a description of the broader construction contract solicited by the Smithsonian Institution ("Smithsonian") in 2000. As we shall see, that solicitation impacts the remedies available to Plaintiff.

### A. Solicitation

The Smithsonian published solicitation number 955301 for construction of the Udvar Hazy Center in Northern Virginia, part of the Smithsonian Institution Naval Air and Space Museum Project ("the Project"). One facet of the construction project included the manufacture and installation of hangar doors for various exhibit hangars. Consolidated Statement of Uncontroverted Facts (Aug. 20, 2007) ("CSUF") ¶ 1; Complaint ¶ 5. The pertinent provision of the solicitation called for the manufacture and installation of three different types of hangar doors: Individually Operated Horizontal Sliding Hangar Doors; Biparting Motor Operated Group Rolling Hangar Doors; and Braced Arm Canopy Hangar Doors, referred to throughout this Opinion as door types A, B and C, respectively. CSUF ¶¶ 3–6; see Solicitation at §§ 08342, 08343 and 08344. Door type C was to be installed in the Main Exhibit Hangar, whereas the other two doors were intended for the Space Hangar.

The solicitation originally required the door manufacturers to have over 35 continuous years of experience in the design, manufacture, and installation of large aircraft sliding hangar doors. CSUF ¶ 8; Original Solicitation ¶ 1.4(A); Plaintiff's Appendix ("Pl.App.") at 5. In addition, the "manufacturer must support with written evidence that they have designed, manufactured and installed a minimum of thirty (30) individually motor operated door systems which have been in satisfactory operation for a minimum of five years, that are equal to or in excess of 12 m. high." Original Solicitation ¶ 1.4(A); Pl.App. at 5.

These experience requirements applied across the board to all three types of hangar doors. Furthermore, under the solicitation, a single manufacturer must furnish all three types of hangar doors for the Project. CSUF ¶ 7. We refer to this all-or-none procurement strategy as the "single manufacturer requirement." The limitation is stated in the following manner within the Solicitation:

Rolling hangar doors for the Restoration Hangar are a part of the complete hangar door enclosure system for this project that also includes braced arm canopy hangar doors for the main Exhibit Hangar and group rolling doors for the Space Hangar. *All hangar doors for this project shall be furnished by a single manufacture responsible for both rolling hangar doors and for braced arm canopy hangar doors.*

1. Hangar doors for the Space Hangar are specified in Division 8, Section 08343, entitled "Biparting Group Motor Operated Horizontal Sliding Hangar Doors."

2. Hangar doors for the Main Exhibit Hangar are specified in Division 8, Section 08344, entitled "Braced Arm Canopy Hangar Doors."

Solicitation § 08342 at ¶ 1.2(D) (emphasis added); Pl.App. at 37–38. The single manufacturer provision appears in each of the three sections, with the corresponding door type. *See* Solicitation § 08343 at ¶ 1.2(D) (door B) and Solicitation § 08344 at ¶ 1.2(D) (door C). The scope of work required contractors to "[f]urnish all supervision, labor, materials, tools, equipment and service required for and incidental to fabrication and erection of the ... hangar doors." Solicitation ¶ 1.2(E).

This procurement scheme did not permit contractors or subcontractors to rely on the experience or previous projects of another door manufacturing company:

Written evidence will include ... installations *made by their Company.* Such lists shall include name of installation, location, Owner, Architect, date installed and specific data as to size of doors, ... Written evidence shall list *only door installations that have been designed, manufactured and installed by the submitting Door Manufacturer.*

Solicitation ¶ 1.4(B) (emphasis added); Pl. App. at 40. Indeed, pursuant to the terms of the Solicitation, as amended, the manufacturer "must certify that they will design and fabricate 90%—later reduced to 75%—or more of the door systems by their personnel and in their production facilities." Solicitation ¶ 1.4(C); Defendant's Appendix ("Def.App.") at 77.

### B. GAO Bid Protest and Contemporaneous Amendments

IDC manufactures, repairs, and replaces hangar doors. IDC hoped to serve as a subcontractor for one of the prime contractors, Hensel Phelps Construction Company, Inc. ("Hensel Phelps") competing for the Smithsonian procurement. Although IDC did not bid on the contract, Hensel Phelps was prepared to use IDC as its preferred subcontractor based on IDC's price, but could only do so if IDC had been deemed qualified and approved by the Smithsonian. Solicitation ¶ 1.4(E). Only three door manufacturers, specified within the solicitation, had been pre-qualified to manufacture the doors for the Project; IDC was not among those manufacturers. *See* Solicitation ¶¶ 1.4(D) and 2.1(A). Because IDC could not meet the stringent experience requirements detailed above, Hensel Phelps was effectively foreclosed from utilizing the company for the Project.

On July 26, 2000, Plaintiff filed a bid protest with what was then known as the General Accounting Office—and has since been

renamed the Government Accountability Office ("GAO")—alleging that specifications advertised in the solicitation were "unduly restrictive and anti-competitive," and were in violation of the Competition in Contracting Act ("CICA") and statutory provisions intended to encourage new competitors. Protest Letter, Def.App. at 41–43; *see* 41 U.S.C. § 253(a)(1)(A) (requiring use of competitive procedures) and 10 U.S.C. § 2319 (rules governing use of qualification requirements). In particular, IDC challenged: (1) the experience requirement of 35–years/30 door installations; and (2) the requirement that a single manufacturer produce all three types of hangar doors and satisfy the experience requirements as to each type of door. Def.App. at 42. This second protest ground was given short shrift in the 3–page letter. The focus was the experience requirements. *See id.* ("[IDC] specifically requests a ruling by the Comptroller General ... finding that the experience requirement is unduly restrictive and recommending to the Agency to revise the experience requirement to permit the participation in this competitive solicitation by all qualified bidders.")

Accompanying the Plaintiff's bid protest letter was a lengthy list evidencing IDC prior experience in manufacturing and repairing horizontal sliding and biparting motor operated rolling hangar doors. Def.App. at 44–70. This list contained no information concerning IDC's prior experience manufacturing braced arm canopy doors. *Id.*

The day before receiving the bid protest, the Smithsonian issued an amendment to the solicitation which decreased the experience requirements from 35 years of experience to 5 years of experience. CSUF ¶ 15. The Smithsonian also reduced the requisite quality assurance showing from 30 doors to 15 doors. Def.App. at 72; 76–77. These voluntary modifications—we hesitate to characterize the amendments as "corrective action," in that they were issued contemporaneously with IDC's protest, but not as a result of the protest or at the direction of the GAO—did not change the single manufacturer requirement. CSUF ¶ 17. Nor did they dispense with the manufacturer certification requirement, although the 90 percent threshold was reduced to 75 percent. CSUF ¶ 18; Def. App. at 73 and 77.

The Smithsonian received IDC's GAO protest on July 27, 2000, the day after it had issued the modifications. Def.App. at 41–70. On July 31, 2000, Mr. John Lapiana, Assistant General Counsel for the Smithsonian, sent a letter to IDC's attorney, Mr. Karl Dix, highlighting the amendments. CSUF ¶ 21. In the letter Mr. Lapiana suggested that the July 26 amendments to the solicitation "should in large part, if not completely, address your client's objections." *Id.* As we noted, the modification did not address all of IDC's objections, but neither party seemed to acknowledge the incongruities in this process which constituted settlement negotiations.

## C. Settlement

On August 10, 2000, Mr. Lapiana sent another letter to Mr. Dix, accompanied by a cover sheet stating, "Is this sufficient?" In the letter, which claims to confirm earlier conversations between the parties, Mr. Lapiana advised IDC that: "... based upon the information submitted to the [GAO] in the course of this protest ... [Plaintiff] satisfies the door manufacturer experience requirements as set forth in the solicitation." Pl. App. at 1. That information package listed IDC's reduced experience with hangar door types A and B, and no experience with door type C. The letter also noted that this determination "in no way, should be interpreted as an endorsement or prior evaluation of any bid that IDC may submit or otherwise participate in, except to the extent described above." *Id.* It closed with the assurance, "[i]f there is any additional information that you may need in withdrawing the protest, please do not hesitate to contact me." *Id.*; see CSUF ¶ 22.

Following receipt of Mr. Lapiana's August 10 letter, IDC withdrew its bid protest. In a letter dated August 14, 2000, IDC advised the GAO that it was withdrawing its protest "due to the action of the Agency in providing [IDC] the opportunity to compete to supply the hangar doors for the ... project." Def. App. at 108.

*D. IDC's Submittal to the Prime Contractor and Architect*

In accordance with what Plaintiff believed to be a settlement agreement, IDC submitted a quotation to Hensel Phelps to supply the hangar doors required for the Project. CSUF ¶ 23. IDC's quotation was the lowest submitted to Hensel Phelps and was used in formulating its bid price. CSUF ¶ 24. On March 29, 2001, the Smithsonian awarded the prime contract to Hensel Phelps.

On April 19, 2001, IDC submitted an ambiguous certification letter to Hensel Phelps. The text of the letter can be read as covering all three door types. *See* Letter of James W. Dillard Sr. to Hensel Phelps (Apr. 19, 2001) ("[IDC] will manufacturer in excess of seventy-five percent (75%) of *the door systems required by this project* with our personnel and in our production facility."); Def.App. at 132 (emphasis added). However, the letter explicitly references only door systems identified by sections 08342 and 08343, pertaining to door types A and B, respectively. The reference line preceding the letter's text appears as:

Ref: Smithsonian Project

National Air & Space Museum

Section 08342 and 08343

Paragraph 1.4 C and D

*Id.* It is silent as to door C, section 08344.

Subsequently, Hensel Phelps directed IDC to submit its qualifications for the hangar doors to the Smithsonian's Project Architect, Hellmuth, Obata, & Kawsabaum ("HOK"). CSUF ¶ 27. Plaintiff's submittals for the three types of hangar doors were provided to HOK on May 7, 2001. CSUF ¶ 31; Def.App. at 112–14 (door type C), 129–31 (door type B), and 140–42 (door type A). With respect to these last two categories, the submittals included a copy of Mr. Lapiana's August 10 letter along with some of the qualifications previously provided to the GAO in its July 26 bid protest package. As the Government noted during oral argument, the submittals did not match precisely—according to the Government, the submittal to HOK contained fewer projects than that reflected in the GAO papers. CSUF ¶ 32 (Door A submittal "contained some of the same experience qualifications provided to the Smithsonian in its July 26, 2000, bid protest package . . ."); *see also,* CSUF ¶ 33 (same as relates to Door B).

IDC's submittal for door type C, like its bid protest package, did not list any experience for the manufacture of braced arm canopy hangar doors. CSUF ¶ 34. Instead, IDC forwarded experience qualifications of another prospective door hangar manufacturer, Door Engineering and Manufacturing Company ("Door Engineering"). Def.App. 113–25. The cover sheet for the door type C submittal transmitted from IDC through Hensel Phelps to the Smithsonian lists Door Engineering as the manufacturer and IDC as the subcontractor/supplier. *See* Submittal 08344 (May 7, 2001); Def.App. at 114. Also included was a letter dated April 24, 2001, from Door Engineering to IDC, which stated the following:

> Door Engineering and Manufacturing will guarantee that 75% or more of each canopy door system for this project will be designed by our personnel and fabricated in our facilities in Kasota, Minnesota.

Def.App. at 114; Pl.App. at 76. Contrary to other later assertions, which we will address in the discussion that follows, nothing in the May 7, 2001, submittal suggests that Door Engineering was to act only in an advisory or consulting capacity. CSUF ¶ 38.

*E. Rejection of IDC's Submittal*

On May 17, 2001, HOK and the Smithsonian rejected and requested revision and resubmission of IDC's submittal for all three types of hangar doors. CSUF, ¶ 40–45. Def.App. at 110, 127, 137.

The reviewer made two general comments justifying the rejection of IDC's submittal for door type A:

1. Does not conform to 08342 ¶ 1.2 D. Manufacturer has not submitted evidence of *any appropriate* Braced Arm Canopy Hanging Doors.

2. 15 submitted door systems must be in satisfactory operation for a min. of 5 years and be 12 m high. Only 5 installa _____ are 12 m high and only *4* of those have been in operation for 5 years.

*See* Reviewers General Comments, Submittal Packages Quality Assurance Form (May 17, 2001); Def.App. at 138 (emphasis in original); CSUF ¶ 45.

The first comment implicitly recognizes that the submitted canopy door experience is that of a third party and invokes the single manufacturer requirement found in subparagraph 1.2(D) of the Solicitation. The second comment is a substantive rejection of IDC's qualifications with respect to this type of door. It compares the amended experience requirements of the solicitation and finds the lesser IDC experience, referred to in the settlement letter, falls short. *See* Def.App. 106 (July 31, 2000 letter); Def.App. at 107 (Aug. 10 letter); Def.App. at 71 (modifications).

The reviewer's general comments on the rejection of IDC's submittal for door type B simply stated, "Does not conform to 08343 ¶ 1.2 D. Manufacturer has not submitted evidence of *any appropriate* Braced Arm Canopy Hanging Doors"—another reference to the single manufacturer requirement. Def. App. at 127 (emphasis in original).

Finally, the reviewer's general comments on the rejection of IDC's submittal for the type C door noted four deficiencies as follows:

1. 08344 ¶ 1.4A/B requires submittal of 15 door installations, *11* were submitted.
2. 5 submitted installations were required to be 12m high; *none* submitted were in excess of 9.15m high.
3. 15 submitted installations required to be in satisfactory operation for 5 years. Only *5* of the submitted 11 have been in service that long.
4. Information incomplete. Does not list: type of operators, type of brakes, type of safety device, type of operation system, type of guides [and] guide rollers, or type of weatherstripping.

Def.App. at 111 (emphasis in original). If viewed as IDC's experience with canopy doors, these comments ignore the settlement agreement, which required no IDC experience on this door type. But as Door Engineering's experience, they fall outside the settlement agreement which did not contemplate IDC's submitting a third party's qualifications.

On June 12, 2001, the Smithsonian notified Hensel Phelps that IDC's submittal for door type C had been rejected. CSUF ¶ 46. IDC responded in writing to Hensel Phelps that the Smithsonian had previously approved IDC as satisfying the experience requirements for manufacturing the hangar doors. It attached Mr. Lapiana's August 10 letter, and forwarded the "previously reviewed and approved" listing of prior door manufacturing projects. *See* Pl.App. 179; CSUF ¶ 48. Mr. Dix made multiple attempts to contact Mr. Lapiana to discuss HOK's rejection of IDC's submittal. On June 13, 2001, he faxed to Mr. Lapiana the letter that IDC had sent to Hensel Phelps one day prior, in which IDC attempts to revise its submittal. CSUF ¶¶ 47–48. The letter could be interpreted as a withdrawal of Door Engineering, although that point is not made explicit. The IDC letter requests that Hensel Phelps "submit [IDC] as the Hangar Door manufacturer for" all three doors, and includes the list of projects which had previously been submitted. CSUF ¶ 47; See Pl.App. at 179. Contrary to Plaintiff's suggestion during oral argument, this letter did not include a revised certification that IDC would manufacture 75% of all three door types with its own personnel and in its own production facilities.

There is no indication in the record that Hensel Phelps, as the prime contractor responsible for choosing its subcontractors, altered its proposal or forwarded the "new submittal," as Mr. Dix described it in his facsimile to Mr. Lapiana. CSUF ¶ 48. We can only be certain that the letter to Hensel Phelps was sent from Mr. Dix to Mr. Lapiana, who then faxed it to the contracting officer. No action was taken in response to this letter by Hensel Phelps or the procuring officials on the Smithsonian Project. CSUF ¶¶ 48–51. Subsequent to HOK's rejection of IDC's earlier submittal, Hensel Phelps awarded the subcontract to another door manufacturer.

## II. *Procedural History*

On September 21, 2005, we granted summary judgment in favor of the Defendant,

holding that there was no mutual intent to contract because the alleged offer was ambiguous. On September 22, 2006, the Federal Circuit reversed, finding that Mr. Lapiana's August 10 letter was "an unambiguous offer to IDC ... stating that IDC 'satisfies the door manufacture experience requirements set forth in the solicitation.' " *Industrial Door Contractors, Inc. v. United States*, 200 Fed.Appx. 977, 980 (Fed.Cir.2006). While recognizing that "IDC still had to compete for the bid and meet any *other* requirements," the Court of Appeals concluded that IDC had withdrawn its bid protest in exchange for the Government's assurance of prequalification. *Id.* (emphasis is original). Accordingly, the Court held that there was mutuality of intent to enter into a contractual agreement, supported by consideration. *Id.* at 980.

On remand, it is our task to "determine whether the contract was breached and, if so, fashion an appropriate remedy." *Id.* at 980. The Plaintiff opened the briefing by filing a motion for partial summary judgment, arguing that the Smithsonian had breached the settlement contract, as defined by the Court of Appeals, and that IDC is entitled to lost profits as a result of that breach. We assume that Plaintiff moved for *partial* summary judgment with the intention of establishing the quantum of lost profits damages at a later stage of litigation.

The United States filed a cross-motion for summary judgment. The Government argues that it is entitled to summary judgment for several reasons. First, the Government argues that it has not breached the settlement reached between IDC and Mr. Lapiana. If the agreement was breached at all, contends the Government, IDC committed the breach in submitting the qualifications of a third party contractor. The Defendant further argues that any breach of the settlement agreement does not entitle the Plaintiff to lost profits. On October 25, 2007, the parties expounded upon these theories during oral argument.

## DISCUSSION

### I. *Standard of Review*

A motion for summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 670 (1997). In considering such motions, the Court resolves all reasonable inferences in the light most favorable to the non-moving party. RCFC 56(c). Where, as here, both parties have moved for summary judgment, the Court applies this standard to both parties and evaluates each motion on its own merits. *See Kanehl v. United States*, 38 Fed.Cl. 89, 98 (1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

On August 20, 2007, the parties filed the consolidated statement of uncontroverted facts pursuant to this Court's special procedures order. As our previous recitation of background facts makes clear, the parties do not dispute the facts in this matter. The agreement between the parties, as well as their actions subsequent to that agreement, is well documented. There are, however, differences in the inferences the parties would have us draw from this factual record. *See e.g.,* CSUF 28–30, 35, 37. As we demonstrate below, however, when viewed in the context of the contemporaneous record these inferences fall decidedly in the Government's favor.

### II. *Scope of Settlement Agreement*

The settlement agreement between IDC and the Smithsonian must be found solely within the correspondence and documents relied upon by the parties' attorneys, Mr. Karl Dix for IDC, and Mr. John Lapiana for the Smithsonian Institution. Indeed the Court of Appeals has defined the scope of that agreement for us. According to the Court, the agreement is defined by Mr. Lapiana's August 10 letter to Mr. Dix and its accompanying cover sheet that stated "Is this sufficient?" Contrary to our initial holding, the Federal Circuit ruled that this letter constituted an unambiguous offer by the Government to IDC, whereby IDC's previously submitted qualifications were deemed to satisfy the door manufacturer experience requirements as set forth in the solicitation. *Indus-*

*trial Door,* 200 Fed.Appx. at 980. The Court went on to interpret this statement as applying to all three types of doors, notwithstanding that IDC had never submitted any door manufacturing experience as to one of the three types of doors described by the solicitation. *Id.*

On remand the existence of a contract is law of the case. We must define the terms of the settlement agreement in order to determine where a breach, if any, has occurred. As we read the decision of the Court of Appeals, the contract consists of an agreement to "prequalify" IDC based solely on the experience requirements for the first two types of doors required under the solicitation. *See id.,* at 980 ("It is indisputable that IDC accepted the government's offer and that consideration was present, namely IDC withdrawing the protest in exchange for the prequalification.") The level of IDC's experience corresponded to what it had submitted to GAO, notwithstanding the amended solicitation. In other words, IDC was entitled to the opportunity to compete for a subcontractor role in this project. As the Smithsonian's counsel qualified, however, the settlement "in no way, should be interpreted as an endorsement or prior evaluation of any bid that IDC may submit or otherwise participate in, except to the extent described above." Lapiana Letter (Aug. 10, 2000).

IDC was simply promised that it would not be kept off of the list of qualified subcontractors for the Project based on the experience criteria that the company had challenged in the GAO bid protest. Moreover, as the Circuit Court noted, despite the prequalification, "IDC still had to compete for the bid and meet any *other* requirements." *Industrial Door,* 200 Fed.Appx. at 980 (emphasis in original). The settlement agreement did not include other dispensations for IDC for requirements like the 75 percent self-manufacturing requirement or the single manufacturer requirement. Plaintiff disagreed with this interpretation at oral argument, positing that the settlement agreement could by implication include these elements. Nevertheless, IDC's counsel conceded at the outset of the hearing that the agreement between IDC and the Smithsonian was silent as to the single manufacturing requirement, the 75 percent manufacturing certification, and the participation of Door Engineering. The parties further agree that the amended specifications for the Project required "the manufacturer [to] certify that it would design and fabricate 75 percent or more of each of the three door systems by its personnel and in its production facilities." CSUF ¶ 18. Plaintiff has never taken the position—in its contemporaneous actions or in the litigation of these motions—that the settlement waived the certification requirement.

## III. *Defining the Breach*

In defining the breach, we find it convenient to start by describing which actions of the Government do not constitute a breach.

### A. *Rejection of Door Engineering*

When it was asked to submit its qualifications for door type C—which was missing from its initial submissions—IDC sought to extend its own pre-qualification to a completely unrelated contractor. It submitted door manufacturing experience data for a company known as Door Engineering and Manufacturing Co. ("Door Engineering"). This company had not been involved in the procurement up to that point—it had never been mentioned in connection with the GAO bid protest, nor had it been included in any aspect of the negotiated settlement of that bid protest.

The Government argued that this late introduction of Door Engineering constitutes a breach of the settlement on the part of the Plaintiff. IDC, and IDC alone, was deemed to have met the experience criteria pursuant to the parties' settlement. Under certain circumstances, a party's repudiation or prior material breach could alter the performance obligations of the Government. *See Alaska Pulp Corp., Inc. v. United States,* 48 Fed.Cl. 655, 659 (2001) (citing E. Allen Farnsworth, Farnsworth on Contracts § 8.20 (2d ed.1998) and Restatement (Second) of Contracts § 243 cmt. a, 253(2) (1981)). It is unnecessary to characterize IDC's actions as a breach. While it may not be a breach, IDC's submission was outside of the terms of the settlement. Rather than rest on an

agreement that imposed no experience requirement on IDC for the third door, IDC simply chose to act outside that agreement. For its part, the Government can hardly be said to have breached a settlement agreement between the Plaintiff and the Smithsonian by rejecting the experience qualifications of a wholly independent entity that was never party to the dispute and whose experience was never a part of the agreement.

### B. Single Manufacturer Requirement

 The rejection of IDC's experience documentation for doors A and B—the Biparting Motor Operated Group Rolling Hangar Doors and the Individually Motor Operated Horizontal Sliding Doors, respectively—was premised first and foremost on the absence of data for IDC's previous installations of door C, the canopy door type required by the solicitation. *See* Def.App. at 127 and 138 ("Manufacturer has not submitted evidence of *any appropriate* Braced Arm Canopy Hangar Doors.") (emphasis in original). Based on the reviewer's specific reference to paragraph 1.2(D), we interpret this language as evidence that the contracting personnel were applying the "single manufacturer" terms of the solicitation: read in context with the certification requirements, the subcontractor door manufacturer must manufacture and install all three types of doors for the Project. *Compare* Solicitation ¶ 1.2(D) ("All hangar doors for this project shall be furnished by a single manufacturer responsible for both rolling hangar doors and for braced arm canopy hangar doors") *and* Solicitation ¶ 1.4(C) ("Door Manufacturer must certify that they will *design and fabricate* 75% or more of the door system *by their personnel and in their production facilities.*") (emphasis added). Notwithstanding the broad definition of "furnish" urged upon us at oral argument, the contemporaneous record—as well as the litigation affidavit of Mr. Dillard, in which he states IDC always intended to "manufacture" all three doors—demonstrates that IDC also viewed paragraph 1.2(D) as a requirement to manufacture each door.

At any rate, we find no violation of the terms of the settlement in the Smithsonian's application of this independent contractor obligation. The agreement allegedly breached in this case does not relieve IDC of meeting any requirements of the solicitation beyond the minimum experience criteria. The Court of Appeals interpretation of the August 10 letter recognized that the Smithsonian was simply bound to honor its commitment to accept IDC as meeting those prerequisites, but that other requirements of the competition remained in force:

> [T]he phrase "except to the extent described above" indicates that there was an endorsement or pre-qualification in the letter, but that it extended no further than recited there. This sentence means that IDC still had to compete for the bid and meet any *other* requirements, but did not limit the previous statement that IDC met the experience requirements for the entire solicitation.

*Industrial Door,* 200 Fed.Appx. at 980 (emphasis in original).

### C. Breach of Settlement Agreement

 Although enforcement of the solicitation's single manufacturer requirement does not breach the prequalification agreement, the request for further submittals does. Plaintiff's rights were impaired by HOK's demand for further supporting evidence for the third door type. Plaintiff could resist such a request by insisting on the settlement.

We cannot find fault with the rejection of Door Engineering's qualifications or with the adherence to the single manufacturing requirement. But the Government's treatment of IDC's submissions repudiates the settlement in other ways. Most notably, IDC's submittal for door type A was rejected, in part, because "15 submitted door systems must be in satisfactorily use for a min. of 5 years and be 12 m high. Only *5* install ___ are 12 m high and only *4* of those have been in operation for 5 years." Def.App. at 138.

Minimum experience requirements for this door were directly at issue in the GAO protest. IDC's qualifications for this door were contemplated by the Smithsonian's August 10 settlement letter. This very same data pertaining to IDC's prior installations of door type B had been submitted with the original proposal package and had been attached to

the GAO protest. This submission "satisfies the door manufacturer experience requirements as set forth in the solicitation." *See Industrial Door,* 200 Fed.Appx. at 979 (quoting August 10 letter held to constitute the Government's unambiguous offer). The Government materially breached the settlement agreement when it rejected IDC's eligibility for the acquisition on this basis. The recognition of IDC's experience as satisfying the solicitation's requirements was "a matter of vital importance," and "goes to the essence of the contract." *See Thomas v. Dept. of Housing and Urban Development,* 124 F.3d 1439, 1442 (Fed.Cir.1997) (determining materiality of breach in settlement context.)

## IV. *Lost Profits*

### A. *Applicable Legal Standards*

■ Although the Smithsonian breached the settlement agreement, IDC is not entitled to lost profits. To recover lost profits for breach of contract, IDC must establish that: (1) the loss was the proximate result of the breach; (2) the loss of profits was foreseeable; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed. Cir.2002). The Plaintiff has disclaimed any measure of damages other than lost profits, although counsel indicated that IDC reserved the right to pursue attorneys' fees at a later point.

To satisfy the first element, the lost profits must flow directly from the breached contract. *Id.* at 1328. In *Wells Fargo Bank v. United States,* the Federal Circuit distinguished between anticipated profits of the contract in question, which are recoverable, and anticipated profits which are too remote and uncertain to be taken into account in formulating damages for breach of contract. The Federal Circuit cites the Claims Court decision in *Ramsey v. United States,* 121 Ct.Cl. 426, 435, 101 F.Supp. 353 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), which quotes the rule stated in *Myerle v. United States,* 33 Ct.Cl. 1, 26, 1800 WL 2024 (1897):

> There is a distinction by which all questions of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate result of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, *although entered into in consequence and on the faith of the principal contract,* then they are too uncertain and remote to be taken into consideration.

88 F.3d 1012, 1022–23 (Fed.Cir.1996) (emphasis added) (citations omitted).

The Government relies on *Wells Fargo* and *Ramsey* for the proposition that lost profits are not recoverable if they result from independent, collateral undertakings distinguishable from the subject contract. *See Wells Fargo,* 88 F.3d at 1022–23; *Ramsey,* 121 Ct.Cl. at 434, 101 F.Supp. 353. In *Wells Fargo,* the Farmers Home Administration breached an agreement with the plaintiff to guarantee its loan. *Wells Fargo,* 88 F.3d at 1018. The Court of Federal Claims awarded lost profits to Wells Fargo that it allegedly would have made upon additional loans that it could have entered into had the guarantee been properly issued. *Id.* The Federal Circuit reversed the trial court's award of lost profits because "[l]ike the lost profits in *Ramsey, Wells Fargo's* loss of interest on additional loans it allegedly could have made had there been no breach is 'too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.'" *Id.* at 1023.

Similarly, in *Ramsey* lost profits were denied because the plaintiff's claim was not for the anticipated profits of the contract in question, but a claim for the anticipated profits of its entire business enterprise. *Ramsey,* 121 Ct.Cl. at 434, 101 F.Supp. 353. The lost profits from the plaintiff's general business activities were found to be "too remote to be classified as a natural result of the government's delay in payment." *Id.* Although Plaintiff's lost profits implicate more than mere general business activities—IDC has a directly related procurement opportu-

nity with prime contractor Hensel Phelps—Defendant argues that the *Ramsey* rule is applicable simply because Hensel Phelps was not a party to the settlement agreement.

The prime contractor-subcontractor relationship between Hensel Phelps and IDC is an independent contract, which is "entered into in consequence and on the faith of [IDC's settlement] contract." *Id.* at 435, 101 F.Supp. 353. The Hensel Phelps contract, and the anticipated profits thereunder, is a collateral undertaking entered into on the assumption that IDC would be deemed a qualified subcontractor. According to the Government, you do not even look beyond this relationship to the fact that Plaintiff stood to get the business from Hensel Phelps. Under *Ramsey*, IDC is not entitled to lost profits arising out of a contract that is distinct from the settlement agreement at issue in this action.

IDC argues it is only seeking the direct profits it would have earned had the Smithsonian not breached the settlement agreement. In support of this argument IDC relies on *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438 (1961). In *Neely*, the plaintiff obtained a lease from the government to mine coal. *Id.* at 139–140, 285 F.2d 438. The Court of Claims held that the government's refusal to permit the plaintiff to engage in strip mining constituted a breach of the lease, and determined that plaintiff was entitled to lost profits. *Id.* at 145, 147, 285 F.2d 438. The court held that lost profits "is a recognized measure of damages, where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established[.]" *Id.* at 146, 285 F.2d 438. The profits lost in *Neely* were profits the plaintiff expected to receive as a direct result of mining coal pursuant to the subject contract.

IDC also cites *Locke v. United States*, in support of its claim for lost profits. 151 Ct.Cl. 262, 283 F.2d 521 (1960). In *Locke*, the Court of Claims held that the plaintiff was entitled to lost profits when his company was wrongfully removed from a list of approved government contractors for typewriter repair services. *Id.* at 268, 283 F.2d 521. Although there are certain factual similarities, the Defendant argues that *Locke* is distinguishable from this action. In *Locke*, the government's breach prevented the plaintiff from competing for contracts with government installations. *Id.* The Court found that the lost profits "directly and naturally resulted from the breach of the contract for which the suit is brought." *Id.* at 267, 283 F.2d 521.

Finally, the Plaintiff relies on *Energy Capital*, as does the Government. Although the result in *Energy Capital* appears to support IDC's case for lost profits, that case does not involve a secondary contract. The anticipated profits there flowed directly from the contract at issue—the parties in privity are one in the same in each—whereas IDC's settlement agreement with the Government is different in scope and nature from the follow-on profit-making venture between IDC and Hensel Phelps. *See, Energy Capital Corp. v. United States*, 47 Fed.Cl. 382, 395 (2000) (distinguishing *Ramsey* and *Wells Fargo*), *rev'd on other grounds*, 302 F.3d 1314 (Fed.Cir.2002).

The question of when lost profits are available in the "independent" or "collateral" contract scenario perplexes us. It is no simple matter to reconcile *Wells Fargo* and *Ramsey*, on the one hand, with *Neely* and *Locke*, on the other. *Wells Fargo* and *Ramsey* suggest that such collateral undertakings can never form the basis of a claim for lost profits. Yet this rule was simply not followed in the Court of Claims decisions cited by IDC. In particular, there is no explanation why lost profits are at least potentially recoverable in *Neely* and *Locke*, even though they involve independent albeit related contracts that are distinguishable from the subject contract. *See Energy Capital*, 47 Fed.Cl. at 395 (noting different standards applied by the Court in *Ramsey* and *Locke* cases).

The difficulties in harmonizing these two lines of precedent do not stand in the way of a decision on Plaintiff's remand. First, as each party has demonstrated, these cases are distinguishable in significant respects. More importantly, however, in this case the breach of the first contract did not directly result in lost profits on the second. The Smithsonian's failure to prequalify IDC on experience

may have prevented IDC from entering into a contract with Hensel Phelps in the first instance. However, other obstacles would have prevented IDC's continuing participation in this procurement.

### B. Proximate Cause and the Speculative Nature of Damages

■ The settlement agreement does not designate IDC as the prospective awardee for the hangar door subcontract, nor does it entitle Plaintiff to profits under the construction contract. There is a logical gap between any agreement between IDC and the Smithsonian concerning prequalification standards, the procurement contract entered into between Hensel Phelps and the Smithsonian, and a putative contract between Hensel Phelps and IDC. IDC has associated these contracts in its case for damages. Applying the standards articulated above, we must tie the promises made to IDC by Mr. Lapiana to the injury actually suffered by IDC.

We find that Plaintiff fails to clear even the first hurdle in its demonstration of lost profits—proximate cause. IDC did not lose its subcontract solely as a result of the Smithsonian's rejection of its past performance qualifications; it also lost the subcontract because it did not agree to manufacture all three doors, including at least 75 percent of door type C. Notwithstanding the Government's breach, IDC *still* would not have been selected by Hensel Phelps to perform this contract. Hensel Phelps could no more disregard the single manufacturer and certification requirements than could IDC. Solicitation ¶¶ 1.2(D); 1.4(A)-(C).

As the Federal Circuit interpreted the bargain struck between the two attorneys, "IDC still had to compete for the bid and meet any *other* requirements" of the solicitation. *Industrial Door*, 200 Fed.Appx. at 980 (emphasis in original). Notwithstanding our finding that the Smithsonian breached its agreement respecting IDC's experience qualifications, IDC could not meet the threshold requirements of the solicitation on the documentary record.

The company's certification tells the whole story. Pursuant to the quality assurance provisions of the Solicitation, specifically,

paragraph 1.4(C), IDC submitted a document on April 19, 2001, purportedly certifying that it "will manufacture in excess of seventy-five percent (75%) of the door systems required by this project with our personnel and in our production facility." Def.App. at 132. As we noted earlier, this purports to be a certification as respects "all" the hangar doors in the project. Yet the certification referenced only sections 08342 and 08343 of the solicitation as the project. *Id.* These were the two types of doors with which IDC had experience. The third "door system required by [the] project"—section 08344—never found its way into the certification. *Id.* IDC thus was conspicuously silent when it came to the production of the canopy hangar doors.

The Plaintiff's participation in this acquisition was also doomed by the solicitation's single manufacturer requirement. *See* Solicitation ¶ 1.2D ("All hangar doors for this project shall be furnished by a single manufacturer responsible for both rolling hangar doors and for braced arm canopy doors.") This provision of the solicitation was challenged by IDC early on. IDC complained of the unduly restrictive nature of the single manufacturer requirement, invoking the Competition in Contacting Act, 41 U.S.C. § 253(a)(1)(A) ("CICA"), which requires "full and open competition through the use of competitive procedures." *See* GAO Protest; Def.App. at 42 ("The specifications advertised ... violate the requirements of [CICA] which require that agencies draft specifications which are not unduly restrictive.") Unlike the experience requirements, this aspect of the procurement was never modified by amendment. Nor was it ever suggested, by the Smithsonian's documents or by Plaintiff's pleadings, that IDC would be given a waiver of these solicitation requirements. Indeed, such an anticompetitive dispensation in itself would likely have violated procurement statutes and regulations. *See e.g.,* Federal Acquisition Regulation, 48 C.F.R. § 1.102–2(c)(3) (2006) (stating requirement to treat contractors and prospective contractors fairly and impartially); *CW Government Travel, Inc. v. United States,* 61 Fed.Cl. 559, 574 (2004) ("Modifying the contract so that it materially departs from the scope of the

original procurement violates CICA by preventing potential bidders from participating or competing for what should be a new procurement.") (citation omitted); *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98 (2004) (same).

## C. Effect of Plaintiff's Affidavit

IDC now posits by a late filed affidavit that it intended to manufacture all three doors, not just the two specifically referenced in the aforementioned certification letter. This subjective intention is merely a litigation position at odds with overwhelming contemporaneous documentary evidence. The contemporaneous evidence—the documents submitted in connection with this procurement and in the course of the GAO protest—leave no doubt as to what IDC proposed.

IDC submitted two mid-briefing affidavits, executed by IDC President Mr. Dillard, each calculated to rebut a government argument. The first, a February 2003 affidavit, accompanied IDC's original briefing on contract formation and was produced during the briefing on remand. The second, dated July 16, 2007, was attached to IDC's response to the Government's cross motion. It counters Defendant's argument that IDC breached the settlement when it sought to qualify Door Engineering as the manufacturer of the braced arm canopy door. IDC contends that the company transmitted Door Engineering's manufacturing experience along with its own experience "solely in order to attempt to avoid further dispute over issues that had already been settled, not because it intended for Door Engineering to furnish the braced arm canopy doors." Dillard Aff. (July 16, 2007) at ¶ 6; *see*, Pl. Resp. at 4. Faced with the argument that IDC could not meet the solicitation's single manufacturer requirement, IDC has a convenient explanation for the mix-up caused by the introduction of this new door manufacturer—Door Engineering was merely to "assist Industrial Door with design of the braced arm canopy doors for the Project, but Industrial Door always intended to manufacture and furnish those doors." *Id.*

The first allegation—that IDC wanted to avoid a dispute—is corroborated only by

IDC's attorney. *See* Affidavit of Karl F. Dix (Feb. 4, 2005) at ¶¶ 17 and 21 (advised client to mitigate damages upon learning that Smithsonian was rejecting IDC's qualifications). Presumably IDC wanted to offer up some solution which would enable them to participate in this procurement without relitigating issues raised by its protest before GAO. IDC's attempts at mitigation are a tacit acknowledgment by IDC that the prospect of an alternative door manufacturer was never a part of the settlement agreement.

As to Mr. Dillard's subjective intent that Door Engineering was not the intended "manufacturer" and, therefore, Plaintiff would not have violated the single manufacturer requirement, we have searched in vain for objective evidence of the limited consulting role described by Mr. Dillard. Consequently, we must carefully consider this evidence and determine whether when viewed through the prism of summary judgment the inferences drawn can overcome the strong factual case in favor of the Government. *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 35 (1st Cir.1970) (Evidence viewed "through prism of summary judgment, which should be granted only when the truth is clear, when no material fact remains for trial, and when the moving party is entitled to judgment as a matter of law.") We find that they do not.

This is one of the few factual issues in this case which is vigorously contested by the parties. *See* CSUF 28–30, 35, 37. At bottom the parties' differences do not pose a factual dispute that stands in the way of summary judgment, however. Even if we accept the allegations of Mr. Dillard at face value, they add little to the case *sub judice*. Mr. Dillard's statements simply evidence his subjective intent in supplying Door Engineering's manufacturing experience. Such evidence is irrelevant in the context of objective legal questions such as contract formation, breach or damages. The statements of IDC's principal are made in affidavit form and, therefore, may be considered to meet the lowest threshold of evidentiary value in a summary judgment context. *Compare CWT/Alexander Travel, Ltd., et al. v. United States*, 78 Fed.Cl. 486, 493 n. 7 (2007) (Plaintiffs failed

to supplement record with their own data or proffer supporting affidavit) (citing *Perri v. United States,* 53 Fed.Cl. 381, 410 (2002); *Slattery v. United States,* 53 Fed.Cl. 258, 281 (2002)). Moreover, Mr. Dillard's supplemental affidavit suffers from a number of defects.

First, the statements are unsupported. As an interested party, Mr. Dillard's contentions carry little weight unless corroborated, if at all possible, by contemporaneous evidence in the record. Mr. Dillard's explanations concerning Door Engineering's supposed limited role are contradicted by IDC's own submission. *See e.g.,* Submittal 083344 (May 7, 2001) (IDC listed as "subcontractor/supplier;" Door Engineering listed as "manufacturer"); Def.App. at 114.

The submittal included correspondence between Door Engineering and IDC in which the former certifies that 75 percent or more of the canopy door systems for the Project—door type C—"will be designed by our personnel and fabricated in our facilities in Kasota, Minnesota." Def.App. at 76. This evidence of Door Engineering as the primary manufacturer of the canopy door is especially compelling when viewed in light of IDC's own certification, which as we have seen, referenced only two door systems identified by sections 08342 and 08343, pertaining to doors A and B. IDC Certification to Hensel Phelps (Apr. 19, 2001); Def.App. at 132.

### D. No Genuine Issue of Material Fact

In summary, the argument "we always intended to comply with the solicitation requirements," carries no weight with this Court. Despite IDC's *post hoc* representations to the contrary, the Plaintiff's reply brief and affidavits amount to little more than "mere allegations or denials of the [Government's] pleadings" and are, therefore, insufficient to establish a genuine issue of material fact or to overcome the evidence in support of summary judgment. *See* RCFC 56(e).

Finally, our findings are not altered by the fact that the Smithsonian's procurement reviewers rejected Door Engineering's qualifications on their merits, rather than prohibiting the contractor's participation explicitly. In his affidavit, Mr. Dix states:

> Neither the Architect or the Smithsonian [ever] objected to the fact that Door Engineering was a separate company during the submittal process. In fact, the submittal comments all show that the reason that Industrial Door's submittals were rejected was because the Smithsonian reneged on its agreement and strictly applied the qualification requirement.

Dix Aff. (Feb. 4, 2005) at ¶ 21. Notwithstanding what the Government parties said or did, it remains the legally relevant fact that the presence of Door Engineering as the proposed manufacturer of door type C was in contravention of the solicitation, and precluded IDC from being awarded the subcontract. There thus is no basis for an exception to the *Ramsey/Wells Fargo* rule excluding profits of consequential lost business from a breach.

### CONCLUSION

We find as a matter of law that the settlement agreement entered into between the parties was breached when the Smithsonian rejected as insufficient the Plaintiff's qualifications on the merits with respect to door type A.

The Smithsonian's breach was not in rejecting the submission detailing the qualifications of Door Engineering, as Plaintiff contends. The experience and qualifications of Door Engineering were never contemplated by the settlement agreement. The memorandum outlining the deficiencies inherent in that company's proposal cannot be interpreted as a transgression of this agreement—the Government did not make any promises with respect to the qualifications of any contractor other than IDC.

We further find that the breach of a settlement agreement does not result in damages for lost profits in connection with the subsequent procurement contract, of which IDC was not a contracting party. Notwithstanding the wrongful exclusion of IDC based on its experience, Plaintiff has not demonstrated that it would have been able to meet independent requirements of the solicitation. The contracting officer would have had no choice but to reject IDC, based on the clear evidence that Door Engineering, and not IDC,

was to manufacture the braced arm canopy door and the absence of IDC's certification that it would manufacture 75 percent of this type door.

We dismiss the Plaintiff's Complaint and find for the Defendant as a matter of law. **Defendant's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Partial Summary Judgment is DENIED.**

**The Clerk of Court is directed to dismiss the Complaint and enter judgment in favor of the Defendant.**

**IT IS SO ORDERED.**